# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| KENNETH WREN and ALICE WREN, husband and wife, | No.  58269-4-II Consolidated with: No.  58272-4-II |
| Respondents, | |
| v. | |
| DAVID G. WHITEHEAD, individually; | UNPUBLISHED OPINION |
| Appellant, | |
| STANFORD AND SONS, LLC, a Washington limited liability company; HERBERT L. WHITEHEAD III, individually; the marital community of HERBER L. WHITEHEAD III and JENNIFER L WHITEHEAD; DAVID G. WHITEHEAD, individually; J & N INVESTMENTS INC., a Washington corporation; HENRY L. RUSSELL II, individually; and the marital community of HENRY L. and VICTORIA L. RUSSELL; SOUTHWEST ENTERPRISES, LLC; a Washington limited liability company; MT. VIEW ENTERPRISES, LLC, a Washington limited liability company; WHITEHEAD CONSULTING, LLC, a Washington limited liability company; WHITEHEAD ENTERPRISES, LLC, a Washington limited liability company; DUWARD WILLIAM FRAME, IV, individually; FIRST TENNESSEE BANK NATIONAL ASSOCIATION d/b/a FIRST HORIZON HOME LOANS; NATIONSTAR MORTGAGE LLC, d/b/a MR. COOPER, a Delaware limited liability company and FIRST | |

NICHOLAS D. LECLERCQ AND SUSAN L. LECLERCQ FAMILY LLC, a Washington limited liability company,

Defendants,

KENNETH BRAUTIGAN and JESSICA BRAUTIGAN, husband and wife and the marital community thereof,

Third Party Defendants.

KENNETH WREN and ALICE WREN, husband and wife,

Appellants,

v.

STANFORD AND SONS, LLC, a Washington limited liability company; HERBERT L. WHITEHEAD III, individually; the marital community of HERBER L. WHITEHEAD III and JENNIFER L WHITEHEAD; DAVID G. WHITEHEAD, individually; J & N INVESTMENTS INC., a Washington corporation; HENRY L. RUSSELL II, individually; and the marital community of HENRY L. and VICTORIA L. RUSSELL,

Respondents,

SOUTHWEST ENTERPRISES, LLC; a Washington limited liability company; MT. VIEW ENTERPRISES, LLC, a Washington limited liability company; WHITEHEAD CONSULTING, LLC, a Washington limited liability company; WHITEHEAD ENTERPRISES, LLC, a Washington limited liability company; DUWARD WILLIAM FRAME, IV, individually; FIRST TENNESSEE BANK NATIONAL ASSOCIATION d/b/a FIRST HORIZON

HOME LOANS; NATIONSTAR
MORTGAGE LLC, dba MR. COOPER, a
Delaware limited liability company and FIRST
NICHOLAS D. LECLERCQ AND SUSAN L.
LECLERCQ FAMILY LLC, a Washington
limited liability company,

                                   Defendants,

KENNETH BRAUTIGAN and JESSICA
BRAUTIGAN, husband and wife and the
marital community thereof,

                    Third Party Defendants.

LEE, J. — This consolidated appeal arises from the sudden closure of Stanford and Sons, LLC (Stanford), a motor vehicle dealership in Puyallup. Kenneth Wren had loaned $1.7 million to Stanford, and seized much of the inventory on Stanford's lot to pay down the loan. David "Gage" Whitehead (Gage) alleged that he had a consignment agreement with Stanford, and that 12 of the vehicles on Stanford's lot belonged to him. He also claimed that Stanford's owner had given him a truck, boat, and trailer as a consignment fee. A lawsuit ensued among Wren, Gage, Stanford, Gage's father Herbert "Butch" Whitehead, III, (Butch),[1] and another party, J&N Investments (J&N).

Gage appeals the trial court's summary judgment order awarding Wren title to the truck, boat, and trailer. Gage argues that based on the trial court's erroneous summary judgment order, it was error for the trial court to submit Wren's claim against Gage for conversion of the truck,

---

[1] This opinion will use the first names of Gage and Butch to avoid confusion. No disrespect is intended.

3

boat, and trailer to the jury. Gage also appeals the trial court's ruling granting Wren's motion in limine to exclude evidence of a $35,000 check written by Butch to Stanford.

Because the record shows that Stanford owned the truck, boat, and trailer, that the property constituted collateral captured by Wren's first-position, perfected security interest, and that Stanford never transferred ownership of the truck, boat, and trailer to Gage, we hold that the trial court did not err when it granted summary judgment in Wren's favor and awarded Wren title to those vehicles. And because the trial court's summary judgment in Wren's favor was proper, the trial court did not err when it submitted Wren's conversion claim against Gage to the jury. Finally, because Gage invited error regarding evidence of the $35,000 check, he is precluded from challenging the trial court's in limine ruling on appeal. Thus, with regard to Gage's appeal, we affirm.

Separately, Wren appeals several judgments and underlying orders regarding (1) Gage's claim of defamation against Wren, (2) Wren's claims of criminal profiteering against Gage, (3) Wren's claims of fraudulent/voidable transfers, conversion, and unjust enrichment against J&N, (4) Wren's claims of fraudulent/voidable transfers against Gage, (5) the trial court's failure to apply Article 9A of the Washington Uniform Commercial Code (UCC) to the 12 vehicles in dispute, and (6) an award of attorney fees to Gage based on a 2020 replevin order.

For the reasons discussed below, we affirm the trial court's judgments and orders regarding defamation; criminal profiteering; fraudulent/voidable transfers, conversion, and unjust enrichment; and the failure to apply Washington's UCC Article 9A. But we reverse the trial court's partial summary judgment on the issue of whether there was a consignment agreement between Gage and Stanford and the resulting judgment involving the 12 disputed vehicles. We

4

also reverse the trial court's determination that Gage was entitled to an award of attorney fees and costs. Accordingly, with regard to Wren's appeal, we affirm in part, reverse in part, and remand the issue of the existence of a consignment agreement and whether that agreement was breached for further proceedings consistent with this opinion.

FACTS

A.    BACKGROUND

Kenneth Brautigan was the sole owner and manager of Stanford, a used car dealership. Stanford conducted business under the trade name Puyallup Car and Truck (PCAT).[2] Brautigan formed Stanford in 2009 with the assistance of Butch. Prior to 2009, Brautigan had worked for Butch at various car dealerships that Butch had previously owned.

In early 2016, Stanford needed additional capital to continue its operations. At the time, Stanford wanted to switch from wholesaling vehicles to retailing vehicles;[3] specifically, Stanford wanted to change to a business model where Stanford would purchase vehicles from private sellers in Canada and sell them to retail buyers in Washington. Brautigan approached Kenneth Wren, a longtime friend, for a loan. Wren, like Brautigan and Butch, also worked in the car industry.

Wren agreed to loan $1,200,000 to Stanford. In March 2016, Brautigan, on behalf of Stanford, executed a promissory note for that amount.[4] Brautigan and Wren also signed several

---

[2] We refer to Stanford and PCAT interchangeably.

[3] A retail transaction refers to a vehicle sale between a dealership and a customer, while a wholesale transaction refers to a sale between dealerships.

[4] In January 2018, Brautigan executed an amended promissory note for the $1,200,000 loan. The amended promissory note lowered the interest rate and monthly payment.

other loan documents to secure Wren's loan. Those documents included a resolution to obtain credit, a pledge agreement in which Brautigan and his wife personally guaranteed the loan, and a commercial security agreement. The commercial security agreement provided that in event of a default, Wren would have "all the rights of a secured party under the Washington UCC." Clerk's Papers (CP) (58269-4-II) at 706. Wren also filed a UCC financing statement with the following listed as collateral:

> All goods, inventory (vehicles, parts, and accessories), motor vehicle title documents, chattel paper, accounts, furniture, fixtures, equipment, investment property, instruments, commercial tort claims, all other tangible and intangible property, and general intangibles including goodwill and proceeds of the sale of the same.

CP (58269-4-II) at 775.

Butch oversaw Stanford's "cash flow, inventory and buying." CP (58269-4-II) at 749. Brautigan was involved with day-to-day operations of Stanford, such as reconditioning vehicles and vehicle sales.

In February 2016, Stanford hired Stephanie Townsend as an office manager. At the time, Stanford was in the process of setting up a new accounting system and one of Townsend's responsibilities included working with Butch to build out the accounting software from scratch. Stanford had two U.S. checking accounts and one Canadian account. Townsend was responsible for the U.S. accounts while Butch handled the Canadian account.

Of Stanford's U.S. bank accounts, there was a "flooring account," used to purchase vehicles, and its regular checking account, which Stanford used to pay vendors or for other expenses. 2 Verbatim Rep. of Proc. (VRP) (Feb. 14, 2023) at 151. The accounting software that Stanford used did not allow for tracking of both bank accounts, so the flooring account was not

6

reflected within the system. According to Townsend, Stanford frequently transferred funds back and forth between the U.S. accounts and she conducted daily bank account reconciliations. Townsend sent a bank account reconciliation email to Brautigan and Butch every morning.

In March 2016, Stanford engaged J&N Investments, owned by Henry "Murphy" Russell (collectively, J&N), to exclusively import vehicles from Canada on its behalf. J&N's normal business model was to import vehicles from Canada and sell those vehicles to various wholesalers or retailers. J&N would mark up the purchase price of each vehicle by $2,000, plus out of pocket cost to cover import fees and reconditioning of the vehicle. According to Murphy, "[t]he markup of $2,000 or more per vehicle cover[ed] the costs of importing, transportation, storage, payroll, interest charges on J&N's line of credit, and other business expenses plus profit for the work performed." CP (58272-4-II) at 1356.

As part of Stanford's exclusive arrangement with J&N, Stanford agreed to pay J&N a fixed price of $25,000 per month, along with J&N's costs, and then purchase the vehicles that J&N imported at cost. The $25,000 plus costs per month was paid in lieu of the $2,000 markup per vehicle. Between 2016 and 2017, J&N imported 521 vehicles for Stanford. However, after approximately 14 months, J&N and Stanford determined that their exclusivity relationship was not as profitable as they had hoped and they ended their arrangement.

Butch referred to the arrangement between Stanford and J&N as "a wholesale type of a relationship," but one that also had elements of consignment. 4 VRP (Feb. 21, 2023) at 472. Stanford and J&N did not have a written agreement.

Generally, in consignment arrangements, the owner of a good, known as the consignor, will execute a written consignment agreement with whoever sells the good, known as the

7

consignee. A consignment agreement contains the terms of the agreement, along with an expiration date and agreed upon payment. In the case of a vehicle, parties may also execute a wholesale order, which transfers ownership from the owner to the buyer.

Following the end of Stanford's relationship with J&N, Stanford attempted to retail as many cars as possible. This involved Butch purchasing Canadian vehicles from private sellers and importing them for Stanford to then sell on its lot. Stanford still intermittently conducted business with J&N, such as consigning vehicles from them or providing occasional reconditioning work.

In February 2017, Brautigan and Butch approached Wren for a second loan. Wren agreed to loan an additional $500,000. Wren and Brautigan again executed several loan documents securing the loan, such as a promissory note, pledge agreement, and commercial security agreement. Brautigan and his wife again personally secured the loan.

Both prior to and after Wren made the loans to Stanford, Stanford provided balance sheets to Wren's employee, Nicola Bley Asquith (Asquith). Asquith had worked in various capacities for Wren over many years, including as an office manager for Wren's car dealerships and overseeing financial operations for those dealerships. Asquith discussed those balance sheets with Wren when she received them. Under the "Liabilities" section of the balance sheets, there was a line item called "Consigner Inventory." Ex. 512, at 2; 513, at 2.

As security for Wren's loans to Stanford, Wren would maintain possession of the title documents for vehicles purchased for Stanford's lot. Once Stanford purchased a vehicle, title documents would be delivered to Asquith for holding until Stanford sold the vehicle to a customer. Wren on occasion stopped by Stanford's lot, but only one time actually checked Stanford's inventory.

B.   STANFORD'S CONSIGNMENT ARRANGEMENT WITH GAGE WHITEHEAD

In 2016, Butch's son, Gage, then 19 years old, began working at Stanford as a vehicle detailer.  In 2017, Gage became a salesperson.  However, by February 2018, Gage stopped working as a salesperson and began accompanying Butch to Canada and assisting him with purchasing vehicles for Stanford.

Gage was interested in learning about the wholesale auto industry and wanted to pursue his own business of purchasing vehicles in Canada and selling them in the U.S.  Gage withdrew $50,000 from his college savings account to start this venture.  Initially, Gage went through money exchanges in Canada to begin purchasing vehicles with cash.  Because Gage was "still very young," Butch primarily handled Gage's money and accounting while Gage identified vehicles to purchase.  CP (58269-4-II) at 279.

J&N allowed Gage to use its dealer license to import vehicles, and Gage initially consigned vehicles through J&N.  Soon thereafter, Gage alleged that Brautigan requested that Gage consign vehicles through Stanford.  According to Gage and Butch, Brautigan wanted to "'keep the money in the family.'"  CP (58269-4-II) at 280.  However, Stanford and Gage never executed a written consignment agreement.

Brautigan allowed Gage to use Stanford's Canadian bank account for Gage's consignment transactions.  For instance, when Gage began consigning vehicles with Stanford, J&N still owed Gage funds from the first few vehicles that Gage consigned.  Instead of paying Gage directly, J&N wired funds to Stanford's Canadian bank account on Gage's behalf.  Butch would track funds allocated to Gage within Stanford's accounts.

9

Based on the nature of purchasing vehicles from private sellers, Gage would sometimes use his own cash to purchase a car on behalf of Stanford, and Butch would allocate a "credit" in Stanford's Canadian bank account to Gage for his future consignment business use. CP (58269-4-II) at 344. According to Butch, Brautigan authorized the arrangement. Butch regularly communicated with both Brautigan and Townsend via text and email regarding vehicles for Gage's consignment business and funds allocated to Gage. Brautigan also communicated with Gage directly regarding Gage's consignment vehicles.

Whenever Gage consigned a vehicle through Stanford, Gage kept physical possession of the title documents and would bring the documents to the dealership if Stanford sold one of his vehicles. Gage's vehicles were never titled in his own name. Instead, the vehicles he consigned typically listed PCAT as the owner or buyer. According to Butch, this was because when Gage consigned vehicles through Stanford, he operated under Stanford's dealer license.

To distinguish Gage's vehicles from vehicles that belonged to Stanford, Gage's vehicles had stickers marked with "Gage Co" or a "G number[]" instead of a traditional stock number.[5] CP (58269-4-II) at 281; 3 VRP (Feb. 15, 2023) at 298. The deal jackets[6] for Gage's vehicles listed Gage's name under a "'Purchased From'" line item. CP (58269-4-II) at 281, 328-330; Ex. 510, at 396. Additionally, the keys to Gage's vehicles were marked differently than Stanford's.

---

[5] Car dealerships use "stock numbers" to track vehicles in their inventory. *See* 2 VRP (Feb. 14, 2023) at 153.

[6] A "deal jacket" is a compilation of all documents and items related to a vehicle. 2 VRP (Feb. 14, 2023) at 192.

Brautigan would either write checks to Gage from Stanford's flooring account as payment for Gage's consignment vehicles or wire funds directly to Stanford's Canadian bank account for Gage's use. While in typical consignment arrangements, funds are owed to a consignor at the time of a consignment sale, Stanford generally paid Gage approximately three weeks after it sold one of his vehicles.

According to Gage, he purchased and consigned 81 vehicles for Stanford between 2018 and 2019. Those 81 vehicles included the following 12, which are at issue in this case:

| Vehicle | G# | Stock # | VIN | Date Purchased |
| --- | --- | --- | --- | --- |
| 2012 Dodge Ram 2500 | G31 | 7068 | 231568 | 11/27/2018 |
| 2009 Jeep Wrangler | G54 | 7126 | 745153 | 3/29/2019 |
| 2004 GMC 2500 | G57 | 7131 | 194426 | 4/3/2019 |
| 2011 Dodge 1500 | G62 | 7156 | 644298 | 4/22/2019 |
| 2007 Jeep Wrangler | G69 | 7175 | 225697 | 5/18/2019 |
| 2005 Ford E-450 | G72 | 7179 | B28253 | 5/21/2019 |
| 2005 Chevy 2500HD | G74 | 7183 | 841987 | 6/2/2019 |
| 2011 Ford Ranger | G75 | 7182 | A56039 | 6/2/2019 |
| 2010 BMW X5 | G77 | 7187 | 381196 | 6/4/2019 |
| 2010 Ford F-150 | G79 | 7198 | B19834 | 6/24/2019 |
| 2014 Jeep Wrangler | G80 | 7197 | 213263 | 6/24/2019 |
| 2013 Ford F-150 | G81 | 7196 | A96344 | 6/24/2019 |

Gage never filed a financing statement as a consignor of any of the vehicles.

C.     STANFORD/PCAT CLOSURE

By January 2019, Stanford was running into financial trouble. In early January, Butch proposed in an email to Brautigan several options to improve Stanford's business prospects. In that email, Butch also mentioned outstanding funds owed to Gage for Gage's consignment vehicles. Butch wrote: "We need to pay Gage his $52,037.00 we still owe him and stay tight on

paying for his cars when we retail them. I'm not going to put him in the hopper just because we suck at making money." Ex. 215, at 2.[7]

Butch and Brautigan came to an agreement on changes to make and how to cut expenses. However, by July 2019, Stanford still was not making the desired profit. On July 11, Brautigan and Butch met to discuss Stanford's status. During that meeting, Butch informed Brautigan that Stanford owed Gage $132,000 from consignment sales.

According to Butch, Brautigan offered a 2015 Chevy truck, 2012 pontoon boat, and 2012 boat trailer (collectively, "truck, boat, and trailer"), which they valued at $88,000, as partial payment in lieu of monies owed to Gage. Part of the reason for the offer was that the truck, boat, and trailer were all already in the Whitehead family possession. Butch took the offer to Gage, and Gage agreed. Further, Brautigan and Butch allegedly agreed to move Stanford out of retail and downsize its operations.

Gage never had a direct conversation with Brautigan about the truck, boat, and trailer. At the time, the truck, boat, and trailer were registered to Stanford. However, Brautigan never took steps to re-register the vehicles to Gage's name, nor was there written documentation of the agreement.

According to Brautigan, it was Butch who suggested that Stanford give Gage the truck, boat, and trailer as partial payment, but Brautigan did not agree. Additionally, Brautigan was "in disbelief" that Butch wanted to liquidate Stanford's assets and downsize. 5 VRP (Feb. 22, 2023) at 601. Butch allegedly rebuffed Brautigan's attempts at follow-up conversations.

---

[7] Exhibit 215 lacks page numbers. For the purpose of our opinion, we number the pages of Exhibit 215 as 1 through 4 starting with the first page.

Nevertheless, between July 11 and July 16, Butch and Brautigan exchanged text messages regarding Stanford's business as if both had agreed to proceed with the plan to downsize Stanford operations. On July 16, Butch sent Brautigan a series of texts regarding vehicles they had planned to sell at auction. However, by the afternoon of July 16 Brautigan had stopped responding.

On July 16, Brautigan decided to shut down Stanford. Brautigan called Wren and informed him of Stanford's financial troubles. Up until that point, Stanford had been making loan payments on a timely basis. Wren instructed Brautigan to go to the Stanford lot to "secure all of [Wren's] assets." 5 VRP (Feb. 22, 2023) at 603. Brautigan went to Stanford's lot, began removing vehicles, and changed the locks.

Gage then received a call from a Stanford salesperson, who informed Gage that Brautigan had sent him out to purchase lunch for the office, but when the salesperson returned, Stanford's gate was closed and locked. Shortly after, Gage and Butch received another call from a friend who saw tow trucks loading and driving away with Stanford inventory. Butch and Gage then drove to Stanford's lot and confronted Brautigan.

Butch requested the keys to Gage's vehicles on Stanford's lot. Brautigan refused and called the police. The police ultimately asked Brautigan to leave the premises. Wren then arrived at the lot. Butch explained to Wren that Gage had 12 consignment vehicles on Stanford's lot at the time and 6 of them had already been removed. By way of compromise regarding the 12 vehicles, Wren and Butch agreed that Wren could maintain possession of the 6 cars already removed while Butch and Gage could take the remaining 6 cars.

Wren took the following six vehicles:

13

| Vehicle | Stock # | VIN |
|---------|---------|-----|
| 2012 Dodge Ram 2500 | 7068 | 231568 |
| 2005 Chevy 2500HD | 7183 | 841987 |
| 2010 BMW X5 | 7187 | 381196 |
| 2010 Ford F-150 | 7198 | B19834 |
| 2014 Jeep Wrangler | 7197 | 213263 |
| 2013 Ford F-150 | 7196 | A96344 |

Butch and Gage took the following six vehicles:

| Vehicle | Stock # | VIN |
|---------|---------|-----|
| 2009 Jeep Wrangler | 7126 | 745153 |
| 2004 GMC 2500 | 7131 | 194426 |
| 2011 Dodge Ram 1500 | 7156 | 644298 |
| 2007 Jeep Wrangler | 7175 | 225697 |
| 2005 Ford E-450 | 7179 | B28253 |
| 2011 Ford Ranger | 7182 | A56039 |

Butch then transferred title of all 12 vehicles to J&N. According to Gage and Butch, the transfer to J&N needed to occur so Gage could sell the vehicles in his possession. Wren never possessed the title documents to any of the 12 vehicles, and Butch's transfer of title to J&N prevented Wren from liquidating the 6 vehicles in his possession.

On July 24, 2019, Brautigan and Wren executed a bill of conveyance in lieu of foreclosure. As of July 23, Stanford owed Wren $1,175,972.18. The bill of conveyance conveyed the following collateral to Wren:

(i)     Used Vehicles and Boat. The Used Vehicles including company vehicles listed on Schedule 1 attached hereto with value of $199,000.00. Debtor shall sign and deliver to Creditor all titles to the Used Vehicles and Boat upon execution thereof.

(ii)    Miscellaneous Inventory. The Debtor's Miscellaneous Inventories listed on Schedule 2 attached hereto with value of $29,500[.]00.

      (iii)    <u>Cash and Receivables</u>. The Debtor's cash of $36,000 and all accounts receivable.

CP (58269-4-II) at 61. Schedule 1 included the truck, boat, and trailer that Brautigan allegedly offered to Gage. Brautigan transferred title for the truck, boat, and trailer to Wren.

Between July 24 and July 31, Wren met twice with Butch, Gage, and Wren's attorney, James Aiken, to discuss the vehicles that Gage claimed were his. Wren and Aiken requested documentation from Butch and Gage demonstrating Gage's ownership of the 12 vehicles in dispute. According to Wren and Aiken, neither Butch nor Gage could produce documents that reflected Gage's ownership. Gage's name was not listed on any of the documentation for the 12 vehicles; instead, PCAT was listed as the buyer or ultimate consignee on the paperwork. However, neither Wren nor Asquith physically possessed the title documents for those 12 vehicles, as was the case for other vehicles sold on Stanford's lot.

Butch requested permission to take the truck, boat, and trailer on a pre-planned family vacation to eastern Washington. Wren agreed, provided that Butch bought insurance for the boat and trailer and returned the vehicles by August 8 if he did not intend to purchase them. According to Wren, Butch expressed a desire to purchase the truck, boat, and trailer, which was part of the reason Wren agreed to let Butch take the vehicles on vacation. Further, per Wren, neither Butch nor Gage disputed that title of the truck, boat, and trailer had been transferred to Wren.

After the Whitehead family trip to eastern Washington, Butch and Gage took the truck, boat, and trailer to Arizona. The Whiteheads left the vehicles in Arizona and did not respond to requests to return them. According to Gage, he believed the truck, boat, and trailer belonged to him and he did not understand that Wren wanted the vehicles returned.

On August 8, Wren and Brautigan executed an amended bill of conveyance in lieu of foreclosure. In the amended bill of conveyance, Brautigan, on behalf of Stanford, assigned to Wren "[a]ll claims and causes of action [Stanford] has against third parties in contract, tort, equity, or otherwise." CP (58269-4-II) at 735. By August 9, communication between Wren and Butch had deteriorated.

Over the next couple months, Gage sold five of the six vehicles he had possession of for a total of approximately $59,000. Gage used the proceeds to continue his consignment business.

D.    COMPLAINT

In January 2020, Wren filed a complaint against several defendants,[8] including Stanford, Gage, Butch, and J&N.[9] Wren did not name Brautigan as a defendant.

Wren alleged that the defendants engaged in a pattern of criminal profiteering and widespread conspiracy to fraudulently transfer Stanford's assets to themselves, thereby causing Stanford to breach its contractual obligations to Wren. Specifically, Wren alleged 10 causes of action against the defendants. Relevant to the appeals before this court, the causes of action include: (1) failure to repay promissory notes against Stanford in the amount of $1,187,872; (2) violations of the Uniform Fraudulent Transfer Act (UFTA) and Uniform Voidable Transfers Act (UVTA) against Gage and J&N; (3) an action for replevin for vehicle titles transferred to J&N, which included the six vehicles that Butch and Gage took on July 16, 2019; (4) conversion and

---

[8] Other listed defendants, not parties to this appeal, included Butch's wife, Jennifer Whitehead, Butch's daughter's boyfriend, and several entities owned by Butch and Jennifer.

[9] In August 2021, Wren filed an amended complaint. The amended complaint is largely the same as the original 2020 complaint. References to the complaint are to the 2021 amended complaint unless explicitly stated otherwise.

unjust enrichment; and (5) fraud and theft in violation of Washington's Criminal Profiteering Act (WCPA), chapter 9A.82 RCW.

Before Wren filed his complaint, Wren communicated with various individuals about his claims against Butch and Gage. Those individuals included Steve Ford, Flynn Schaefer, and Jim Kriens.

Before filing the complaint, Wren texted with Ford about the truck, boat, and trailer that Butch and Gage had taken to Arizona. One of Wren's texts stated: "I think I found the boat in Sunland. . . . We found payment of almost all cars Gage claims as coming from our checkbook." Ex. 520, at 3.

Wren sent copy of his draft complaint to Schaefer via email. Wren requested that Schaefer read the complaint and show it to a friend of his at the Puyallup police department.

In a text exchange with Kriens before the complaint was filed, Wren and Kriens discussed the vehicles in dispute:

[Kriens:] . . . I can't believe people do this sh**.

[Wren:] What sh**?

[Kriens:] Stiff people and don't pay off vehicles.

. . . .

Hope things are working out on the [PCAT] closing.

[Wren:] It's not. Murphy won't talk to us. Butch has hid my cars and boat. So I repossessed his sons and daughters [sic] cars. Had to hire a private investigator in [C]anada. Forensic accountant. Crime related litigator. Handwriting expert. I tried to get [Butch] to sit down. I even tried to talk to his wife. He's going to put himself and his son in jail. We are waiting for the Puyallup police to make a decision on the fraud[,] embezzlement[,] and forgery issues.

17

[Kriens:] Omg. That's crazy. Sorry to hear that. I had no idea it would get this bad.

. . . .

[Kriens:] How [sic] life treating you Kenny. Getting it fixed?

[Wren:] Life is good. This will change Butch, [G]age and Murphy's life forever. Sad.

Ex. 523, at 1-2. Wren also sent copies of his filed complaint to Ford, Pattinson, and Wheeler.

Both Wren and the Whiteheads live in the small community of Lake Tapps. Gage's childhood best friend was Ford's son, Austin. Gage learned that Wren had called him a criminal after Gage's mother attended a community gathering with Ford's wife. After Wren made allegations against Butch and Gage, the Whiteheads and the Fords no longer had a relationship. Additionally, multiple individuals in Gage's social circle asked Gage if he was going to jail, and Gage no longer has contact with several people he has known since childhood.

Schaefer, Kriens, Pattinson, and Wheeler all work in the automobile industry in various capacities. Additionally, Kriens' wife is a manager at an auto auction where Gage had done business, and Kriens' brother-in-law owns auto auctions in Auburn and Spokane.

In December 2019, Wren and Brautigan drafted a letter to Stanford's Canadian customers. The letter, signed by Brautigan, stated in part:

My name is Kenneth Brautigan and I am sole member/owner of Stanford and Sons LLC/Puyallup Car and Truck in Washington State. In July of this year I was forced to close my dealership due to embezzlement and fraud committed by several people associated with my company.

. . . .

Because of the manner in which the embezzlement and fraud occurred, some of the purchase orders and other documents were altered between the time the customer

18

> was paid and the vehicle was retailed at my store. Basically, I am just trying to decipher the dollar amount that was taken fraudulently.
>
> . . . .
>
> . . . I had entrusted my faith in people who did not have my family or my business's best interests at heart and now I am trying to pick up the pieces of my life's work.

Ex. 527, at 2. Butch and Gage were the only individuals associated with Stanford who conducted business in Canada. According to Gage, he experienced a significant drop-off in business referrals in Canada. Additionally, the individuals and businesses that Wren communicated with regarding his complaint stopped conducting business with Gage. Gage currently primarily conducts his consignment business with individuals and companies over 100 miles away.

E.      PROCEDURAL HISTORY[10]

In response to Wren's complaint, Gage filed several counterclaims and cross-claims, including that Stanford breached its consignment agreement with Gage; Gage was the rightful owner of the six vehicles Wren took from the Stanford lot on July 16, 2019, along with the truck, boat, and trailer that Brautigan allegedly offered him; and that Wren defamed Gage and caused substantial harm to his reputation.

In March 2020, the trial court ordered Butch and Gage to return the truck, boat, and trailer to Washington by May.

---

[10] Litigation in this case has been ongoing for several years, involves several parties, motions, orders, and separate lawsuits, both in state court and bankruptcy court. While the various motions and lawsuits are related, we discuss only the procedural history that is directly pertinent to the issues and parties before this court.

1. Motion for Partial Summary Judgment Regarding Truck, Boat, and Trailer

In August 2022, Wren filed a motion for partial summary judgment regarding the truck, boat, and trailer. Specifically, Wren requested the trial court to enter a summary judgment finding

(1), that Defendant Gage Whitehead committed three [criminal profiteering] predicate acts of theft, RCW 9A.82.010(4)(e), and three [criminal profiteering] predicate acts of organized retail theft, RCW 9A.82.010(4)(pp), for a total of six predicates, and three acts of conversion, arising from their theft of the 2015 truck, 2012 boat and 2012 trailer, and (2), that plaintiffs Wren are entitled to replevin, and to quieted title, in each of the three items of property at issue here.

CP (58269-4-II) at 266.

In response, Gage argued that he did not steal the truck, boat, and trailer; rather, the dispute over the truck, boat, and trailer was one of contract. Specifically, based on Brautigan's alleged offer of the truck, boat, and trailer in lieu of payment for a consignment contract, Gage had "an ownership claim." CP (58269-4-II) at 434.

In September 2022, the trial court granted Wren's motion in part to quiet title in the truck, boat, and trailer in Wren's name (September 2022 Order). The trial court granted Wren permission to sell the truck, boat, and trailer in a commercially reasonable manner. However, the trial court denied the remainder of Wren's motion.

2. Existence of a Consignment Contract

In August 2022, Gage filed a motion for partial summary judgment against Stanford regarding the existence of a consignment contract and argued that Stanford breached that contract. Gage claimed that Stanford's course of performance and course of dealing demonstrated a consignment arrangement, and that Stanford's failure to pay Gage was a breach of that arrangement.

Both Wren and Stanford opposed Gage's motion. Wren argued that the evidence demonstrated that Gage's alleged consignment vehicles were bought with Stanford funds, Gage failed to produce any written consignment agreements, and Gage was in violation of Washington vehicle consignment law. Stanford argued that Gage failed to establish the existence of a consignment agreement, and moreover, Stanford was not involved in any consignments whatsoever. Brautigan submitted a declaration in which he stated that he had no consignment agreement with Gage.

The trial court granted Gage's motion for partial summary judgment and entered an order finding that Gage and Stanford entered into a consignment contract and that Stanford breached that contract (October 2022 Consignment Order).

3.      Orders Pertaining to J&N

In May 2022, J&N filed a motion for partial summary judgment, seeking dismissal of Wren's claims against it under the UFTA/UVTA, chapter 19.40 RCW. J&N argued that it ended its exclusivity agreement with Stanford two years before Stanford shut down its operations, and during the exclusivity agreement, Stanford received reasonably equivalent value for the payments it made to J&N. Additionally, J&N argued that it was a good faith transferee and did not have any intent to hinder, defraud, or delay repayment of Wren's loan.

Wren opposed J&N's motion. Wren asserted that J&N's arrangement with Stanford was concealed from him, that the monthly $25,000 payments to J&N were loans made for no value, and that the 12 vehicles in dispute that Butch transferred to J&N constituted fraudulent transfers. However, the trial court agreed with J&N and granted J&N's motion to dismiss the UFTA claims (June 2022 Order – J&N).

In December 2022, J&N filed another motion for partial summary judgment, seeking dismissal of Wren's claims against it for conversion and unjust enrichment. J&N argued that Wren's causes of action relied on the exact same facts as the dismissed UFTA/UVTA claims and that it never possessed or retained the proceeds of the 12 vehicles in dispute.

Wren again opposed J&N's motion, arguing that J&N unlawfully retained and absconded with Goods and Services Tax (GST)[11] refunds, received during the course of the exclusivity agreement, that rightfully belonged to Stanford.

In January 2023, the trial court granted J&N's motion and entered an order dismissing Wren's claims for conversion and unjust enrichment against J&N (January 2023 Order – J&N).

4.      Motion for Partial Summary Judgment Regarding the 12 Vehicles

In December 2022, Wren moved for partial summary judgment regarding the 12 vehicles in dispute. Specifically, Wren sought an order from the trial court "that [his] perfected security interest in . . . those twelve vehicles . . . is superior to that of defendant David Gage Whitehead under his alleged oral consignment agreements related to those same vehicles." CP (58272-4-II) at 2471-72. Wren based the motion on the provisions of Article 9A of the Washington UCC. Wren argued that Gage had no evidence of legal title to any of the 12 vehicles.

In response, Gage argued that genuine issues of material fact precluded entry of summary judgment on the issue of the 12 vehicles. Specifically, Gage argued that his consignment arrangement with Stanford fell outside Washington's UCC Article 9A's definition of consignment, so the issue came down to whether Wren was aware if Stanford was substantially engaged in

---

[11] GST is a tax imposed on sale of products in Canada. The tax collected can be refunded to a purchaser for products that are ultimately imported.

consigning vehicles, and if so, Gage's consignment "interest" would take priority over Wren's interest. CP (58272-4-II) at 2612. Gage alleged in part that Stanford's business arrangement with J&N from 2016 to 2017 was a consignment arrangement.

The trial court denied Wren's motion (January 2023 Order – 12 Vehicles).

5.      Motion in Limine Regarding $35,000 Check

The trial court set trial to begin in February 2023. Prior to trial, Wren filed motions in limine. Specifically, Wren sought to exclude Butch, Gage, their counsel, and their witnesses from

> directly or indirectly mentioning, referring to, commenting upon, testifying regarding, or introducing evidence to the effect that the $35,000 in proceeds from Herbert "Butch" Whitehead's Check Number 2020, dated December 17, 2018, . . . should be credited or applied to the benefit of David Gage Whitehead's alleged consignment vehicle business because that $35,000 check was already applied to the benefit of Herbert "Butch" Whitehead to reducing the debt he owes to plaintiffs under the Corrected CR 54(b) Final Judgment entered in this case on December 3, 2021.

CP (58269-4-II) at 453. In a spreadsheet listing the vehicles Gage consigned, a sum of $35,000 was attributed as belonging to Gage, and an amount that Gage claimed Stanford owed him, for his consignment business. The only notation related to the $35,000 on the spreadsheet was that it was a deposit for "loan repayment." CP (58269-4-II) at 1231 (bold face omitted). The spreadsheet did not contain other details related to the $35,000 specifically.

Separately, in Wren's complaint, Wren alleged that Stanford had extended a $250,000 line of credit (LOC) to Butch, his wife, and their business entities in 2010. Butch, Wren, and Brautigan disputed the nature of payments related to the LOC and whether there was any amount due and owing, and to whom, under the terms of the LOC. This resulted in a separate lawsuit that came

up on appeal before this court (LOC Appeal). *See generally Wren v. Stanford & Sons, LLC*, No. 56441-6-II (Wash. Ct. App. May 9, 2023) (unpublished), *review denied*, 2 Wn.3d 1017 (2024).[12]

In the LOC Appeal, Butch challenged the trial court's final judgment against him for debt he allegedly owed under the LOC. *Id.* at 2-3. Apparently, in a CR 54(b) final judgment,[13] the trial court had found that Butch was liable to Wren under the terms of the LOC. The trial court's CR 54(b) order stemmed from an order granting partial summary judgment finding that payments Stanford made to Butch were loans. *Id.* at 2.

A $35,000 check that Butch wrote to Stanford in December 2018 had been incorporated into the accounting of the debt that Butch allegedly owed. In the LOC Appeal, Butch did not specifically assign error to the inclusion of that check in the accounting. Instead, Butch argued that there were genuine issues of material fact as to whether Stanford lent money to Butch under the LOC or if the payments were for work Butch performed. *Id.*

We reversed and remanded the LOC Appeal, holding that genuine issues of material fact existed. *Id.* at 17-18. We instructed the trial court to vacate the judgment against Butch, and "engage in further proceedings to resolve whether the checks were loans or compensation for work performed."[14] *Id.* at 17. The LOC Appeal did not address specific payments. *See generally id.* at 1-19.

---

[12] https://www.courts.wa.gov/opinions/pdf/D2%2056441-6-II%20Unpublished%20Opinion.pdf.

[13] The CR 54(b) judgment, dated December 3, 2021, is not part of the record in this appeal.

[14] Our Supreme Court denied review in February 2024. *See Wren v. Stanford & Sons*, 2 Wn.3d 1017 (2024).

At the time of Wren's motion in limine, the LOC Appeal was still pending before this court. Given the pending LOC Appeal and that the $35,000 check had been attributed to Butch, Gage agreed that references to the check should be excluded. The trial court granted the motion to exclude reference to the $35,000 check.

6.      Trial Causes of Action

The issues remaining for trial included: Gage's alleged conversion of the truck, boat, and trailer; defamation; criminal profiteering; violations of the UFTA/UVTA; and application of the Washington UCC as it pertained to the 12 vehicles in dispute.

7.      Verdicts

Following trial, the jury found that Gage intentionally converted the truck, boat, and trailer. As it pertained to the conversion of those items, the trial court entered a judgment against Gage in favor of Wren for $92,356 (Conversion Judgment).

The jury also determined that Stanford owed Gage $87,881.55 in damages for breach of a consignment contract. The trial court entered a final judgment against Stanford in favor of Gage for that amount (Consignment Judgment).

The jury also found that Wren defamed Gage and awarded Gage $403,166.67 in damages. Additionally, the jury determined that while Wren was unaware that Gage was consigning vehicles with Stanford, Wren was aware that Stanford was substantially engaged in consigning vehicles, and awarded Gage the 12 vehicles in dispute. The trial court entered an order accordingly (Defamation and UCC Judgment).

8.      Award of Attorney Fees

Following trial, Gage moved for entry of judgment and award of attorney fees and costs under the replevin statute, chapter 7.64 RCW. Gage's counsel claimed $210,463.20 in total fees over the course of the litigation; however, based on segregation of successful claims and issues, Gage's counsel applied a 40% downward adjustment, and requested $126,569.50 in attorney fees and another $17,939.45 in costs. Gage's counsel submitted a declaration regarding his hourly billing rates, along with an invoice that broke down the legal services provided.

Wren opposed Gage's motion and argued that Gage failed to comply with the required lodestar formula in his fee request. Wren argued that because Gage failed to comply with a proper lodestar analysis, Gage's motion for fees should be denied in its entirety, or limited to a maximum award of $34,435.50.

In June 2023, the trial court held a hearing on Gage's motion for attorney fees and costs. Following argument by the parties, the trial court stated:

> It's complicated, and I came in near the end of this at I suppose the grand finale of the whole thing. If you follow it, you have been through three different trial judges. So it's really not possible for me, other than looking at the pleadings and having sat through the trial and pretrial motions, some of them, to be precise.
>
> So you documented $210,000 that you believe are attributable to Gage Whitehead, and then you backed it out 40 percent. I'm going to give you half of it, half of the 210, whatever actual amount it is. I am going to award the costs. I think that is appropriate, especially in these cases with the heightened utilization of experts for trial preparation in many different contexts. I think that's a legitimate cost. So you can work out of arithmetic.

VRP (June 16, 2023) at 7. Then, in the written order, the trial court awarded Gage $105,231.60 in attorney fees and $8,969.73 in costs. The trial court wrote:

The Court considered Defendant David "Gage" Whitehead's request for fees and costs in light of the subject statute, RCW 7.64.035(l)(b), for which the fees and costs are recoverable, and in light of the fact that there were a common core of facts and claims that were necessary for Defendant David "Gage" Whitehead to prevail against Plaintiffs Wren[s]' replevin claim for twelve vehicles at issue in this case. For Defendant David "Gage" Whitehead to prevail, he first had to establish that he had a valid vehicle consignment agreement with [Stanford] dba [PCAT]. Next, he had to demonstrate that, under the law, he had a priority interest in the vehicles over Plaintiffs Wren's [sic] security interest in all the assets of [Stanford]. The Court finds that the hours requested for reimbursement by counsel are reasonable, that the hourly rates charged by counsel are reasonable, and that the segregation and allocation of fees are reasonable. The Court also finds that the request for costs to be reasonable, including those of Defendant David "Gage" Whitehead's expert, Hank Khars of BakerTilly. The Court expressly finds that the request for fees and costs as set forth in Defendant David "Gage" Whitehead's counsel's declarations to be reasonable and in compliance with the Lodestar formula.

CP (58272-4-II) at 3701-02.

9.      Appeals and Consolidation

Gage appeals the trial court's September 2022 Order awarding Wren the truck, boat, and trailer and the trial court ruling granting Wren's motion in limine regarding the exclusion of references to the $35,000 check.

Wren separately appeals (1) the June 2022 Order – J&N, the January 2023 Order – J&N, and the judgment resulting from those orders; (2) the Defamation and UCC Judgment; (3) the Consignment Judgment; and (4) the June 2023 order granting Gage attorney fees.

Wren filed a motion to consolidate the appeals as they both arise from the same set of facts. We granted Wren's motion to consolidate and instructed that the briefing remain separate but the cases would otherwise be consolidated for the purposes of oral argument and consideration by the court.

GAGE WHITEHEAD APPEAL—ANALYSIS

Gage challenges the trial court's September 2022 Order granting partial summary judgment in favor of Wren, awarding Wren the truck, boat, and trailer .  Based on Gage's assignment of error to the September 2022 Order, Gage also challenges the trial court's submission of Wren's conversion claim against Gage for those same items to the jury.  Finally, Gage argues that the trial court erred when it granted Wren's motion in limine to exclude reference to a $35,000 check.

We hold that the trial court did not err when it granted summary judgment in favor of Wren and awarded the truck, boat, and trailer to Wren.  We also hold that the trial court did not err when it granted Wren's motion in limine regarding the $35,000 check.

A.      MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING TRUCK, BOAT, AND TRAILER

1.      Legal Principles

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  CR 56(c).  We review summary judgment rulings de novo and engage in the same inquiry as the trial court.  *Schiff v. Liberty Mut. Fire Ins. Co.*, 2 Wn.3d 762, 769, 542 P.3d 1002 (2024).  Courts "review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).

When reviewing orders on summary judgment, appellate courts "consider only evidence and issues called to the attention of the trial court."  RAP 9.12.  Generally, arguments not raised at the trial court level will not be considered on appeal.  RAP 2.5(a); *Wingert v. Yellow Freight Sys., Inc.*, 146 Wn.2d 841, 853, 50 P.3d 256 (2002); *accord Deien v. Seattle City Light*, 26 Wn. App. 2d 57, 63, 527 P.3d 102 (2023) (stating "we will not entertain claims of error on appeal that were

not first presented to the trial court" (citing RAP 2.5(a))); *Wash. Fed. Sav. v. Klein*, 177 Wn. App. 22, 29, 311 P.3d 53 (2013) ("As a general matter, an argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal."), *review denied*, 179 Wn.2d 1019 (2014).

  2.  Trial Court Did Not Err in Awarding Wren the Truck, Boat, and Trailer

Gage argues that the trial court erred when it awarded the truck, boat, and trailer to Wren. Specifically, Gage argues that the truck, boat, and trailer constituted consignment "proceeds derived from the sale of the consignment vehicles," to which Wren's perfected security interest never attached. Br. of Appellant (58269-4-II) at 19. Wren argues that he was a senior lienholder who had a perfected security interest in the truck, boat, and trailer, and that Gage cannot demonstrate that he ever held a higher priority interest in the property.

As a threshold matter, Gage advances a new argument on appeal regarding the truck, boat, and trailer—specifically, that the dispute regarding those vehicles revolves around priority and Washington's UCC Article 9A's definition of "consignment." Br. of Appellant (58269-4-II) at 16. Gage argues that the truck, boat, and trailer constitute consignment "proceeds" to which Wren's security interest never attached and that this court should determine a constructive trust is appropriate. Br. of Appellant (58269-4-II) at 20.

Gage failed to present these legal theories at the summary judgment stage. Instead, at the summary judgment stage, Gage's legal theory centered on contract issues and whether disputes over the existence of an oral contract should be determined on summary judgment. Gage did not invoke the UCC in his prior arguments, and indeed, at the time, the trial court had not yet determined that Gage had any consignment contract with Stanford.

Appellate courts "consider only evidence and issues called to the attention of the trial court." RAP 9.12. Furthermore, arguments not raised at the trial court level will not be considered on appeal. RAP 2.5(a); *Wingert*, 146 Wn.2d at 853. Accordingly, we decline to address Gage's arguments on appeal.

But even if we address the merits of Gage's argument, Gage's challenge fails. Here, the record shows that the truck, boat, and trailer, despite being in the Whitehead family possession, were bought and owned by Stanford. The record also shows that Wren and Brautigan, on behalf of Stanford, executed a commercial security agreement in conjunction with Wren's loans and that Wren filed a UCC financing statement listing his interest in the following collateral:

> All goods, inventory (vehicles, parts, and accessories), motor vehicle title documents, chattel paper, accounts, furniture, fixtures, equipment, investment property, instruments, commercial tort claims, all other tangible and intangible property, and general intangibles including goodwill and proceeds of the sale of the same.

CP (58269-4-II) at 775.

Despite Gage's argument to the contrary, Gage never owned the truck, boat, and trailer. Even considering all facts and reasonable inferences in a light most favorable to Gage—that is, if we assume Brautigan did offer the truck, boat, and trailer to Gage in lieu of payment for money owed under a consignment agreement and that Gage agreed—the fact remains that Brautigan never transferred ownership of or title to the property to Gage. Instead, Brautigan transferred the truck, boat, and trailer to Wren. As Gage admitted during the summary judgment proceedings, this is a contract dispute, not a UCC dispute.[15]

---

[15] Moreover, the record shows that Gage never filed UCC financing statements for his consignment vehicles.

By failing to transfer title of the truck, boat, and trailer to Gage and instead transferring those assets to Wren, Brautigan simply reneged his offer of *specific* compensation. This is distinguishable from the *amount* Stanford owed Gage for the alleged consignment contract, a distinction that Gage fails to discuss. To the extent Stanford owed Gage a certain sum of money, Gage is still entitled to that sum of money regardless of how it was paid. Furthermore, the record shows that Stanford typically paid Gage in cash for the consignment vehicles. Nothing in the record shows, nor does Gage argue, that Gage had his pick of how he was paid from the consignment arrangement, whether in the form of cash or with other physical assets.

The record shows that Stanford paid for and owned the truck, boat, and trailer, those assets constituted collateral captured by Wren's loan documents, Wren had a perfected first-position security interest in Stanford's collateral, and Brautigan never transferred ownership of those assets to Gage. Therefore, we hold that the trial court did not err when it awarded Wren the truck, boat, and trailer on partial summary judgment. Furthermore, because the trial court did not err in awarding the truck, boat, and trailer to Wren on partial summary judgment, the trial court necessarily did not err when it submitted Wren's conversion claim to the jury.

B.      MOTION IN LIMINE REGARDING $35,000 CHECK

1.      Legal Principles

A trial court's decision to grant a pretrial motion to exclude evidence is discretionary. *Douglas v. Freeman*, 117 Wn.2d 242, 255, 814 P.2d 1160 (1991). The decision to exclude evidence will be reversed only when the trial court has abused its discretion. *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). "An abuse of discretion occurs when the trial court's decision is based on untenable grounds or untenable reasons." *Id.*

31

"The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). Courts consider whether a party "affirmatively assented to the error, materially contributed to it, or benefited from it." *Id.*

2.      Invited Error

Gage argues that the trial court's decision to exclude evidence that Stanford owed him an additional $35,000 "should be overturned" in light of the fact that the LOC Appeal, in which a $35,000 check had been accounted for as money Butch owed Stanford, was reversed and remanded. Br. of Appellant (58269-4-II) at 25. We disagree.

Here, the record shows that Gage did not object to Wren's motion in limine to exclude evidence of the $35,000 check. In fact, Gage *affirmatively agreed* to its exclusion based on the pendency of the LOC Appeal.[16] "The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal." *Mercado*, 181 Wn. App. at 630. Thus, we hold that Gage invited the alleged error and is precluded from obtaining relief under the invited error doctrine.

Because Gage agreed to exclude evidence of the $35,000 check, the trial court cannot be said to have based its decision on untenable grounds or for untenable reasons. *Kappelman*, 167 Wn.2d at 6.[17] Thus, Gage's challenge fails.

---

[16] Moreover, the LOC Appeal did not address specific payments. The issue in the LOC Appeal was whether Stanford lent money to Butch under the LOC or if payments Stanford made to Butch were for work that Butch performed. *Wren*, No. 56441-6-II, slip op. at 2.

[17] Also, despite Gage's designation of "Oral ruling by Judge Rumbaugh during motions in limine hearing on February 9, 2023" in his notice of appeal, a copy of the transcript from February 9,

C.      WREN'S ATTEMPTED ASSIGNMENTS OF ERROR IN THE GAGE WHITEHEAD APPEAL

In Wren's response to Gage's brief, Wren presents his own assignments of error regarding the trial court's September 2022 Order, which are unrelated to issues raised by Gage in his appeal. Wren did not cross-appeal the September 2022 Order.

Even so, Wren's first two attempts to assign error pertain to whether the trial court erred in denying his partial summary judgment motion on his conversion claim against Gage and should have found as a matter of law that Gage willfully converted the truck, boat, and trailer, thereby rendering the jury verdict that Gage converted the truck, boat, and trailer moot. "[W]e do not review a trial court's denial of a summary judgment after a jury trial under RAP 2.2." *Leitner v. City of Tacoma*, 15 Wn. App. 2d 1, 18, 476 P.3d 618 (2020), *review denied*, 196 Wn.2d 1045 (2021); *accord McLelland v. Paxton*, 11 Wn. App. 2d 181, 204, 453 P.3d 1 (2019) ("A summary judgment denial, whether right or wrong, cannot be appealed following a trial if the denial was based on a determination that material facts are disputed and must be resolved by the fact finder.").

Here, the jury determined that Gage did, in fact, convert the truck, boat, and trailer, and that the conversion constituted willful misconduct. Thus, we decline to address Wren's first two attempted assignments of error raised in his response brief in Gage's appeal.

Wren's attempted assignments of error 3 and 5 pertain to Wren's arguments in his own appeal regarding the WCPA and application of the Washington UCC. Accordingly, we decline to address these challenges here.

---

2023 was never designated in the record or later provided. Notice of Appeal at 23 (Jun. 5, 2023). Thus, there is no record to show the trial court based its decision on something other than Gage's agreement to exclude evidence of the $35,000.

Finally, Wren's attempted assignment of error 4 alleges the trial court erred when it failed to grant Wren's motion to strike an exhibit from one of Butch's declarations. However, in his briefing, Wren states that the exhibit "does not appear to be relevant to the issues on appeal in this Case #58269-4-II [Gage's appeal]." Br. of Resp't (58269-4-II) at 64. Also, Wren only challenges the exhibit insofar as this court *might* find it relevant to the issues in Gage's appeal. Wren then argues that the trial court's failure to strike the exhibit "was in error for the reasons stated at CP 437, 445-446, and in the 9/6/22 Declaration of Nancy Tyler." Br. of Resp't (58269-4-II) at 65. Arguments "incorporated by reference to other briefing [are] not properly before this court." *State v. Gamble*, 168 Wn.2d 161, 180, 225 P.3d 973 (2010); *accord Diversified Wood Recycling, Inc. v. Johnson*, 161 Wn. App. 859, 890, 251 P.3d 293, *review denied*, 172 Wn.2d 1025 (2011); *State v. I.N.A.*, 9 Wn. App. 2d 422, 426, 446 P.3d 175 (2019). Therefore, we decline to address Wren's assignment of error 4.

## CONCLUSION ON GAGE WHITEHEAD APPEAL

We affirm trial court's partial summary judgment order awarding the truck, boat, and trailer to Wren. We also affirm the trial court's exclusion of reference to the $35,000 check.

## KENNETH WREN APPEAL—ANALYSIS

Wren designates four judgments and/or orders for review in a notice of appeal and amended notice of appeal. Specifically, Wren challenges the following: (1) summary judgment orders in favor of J&N Investments (June 2022 Order—J&N, January 2023 Order—J&N, and judgment resulting from those orders); (2) a judgment in favor of Gage against Wren for $480,486.67, dated May 3, 2023 (Defamation and UCC Judgment); (3) a judgment in favor of Gage against Stanford

34

for $87,881.55, dated May 3, 2023 (Consignment Judgment); and (4) an order granting an award of attorney fees and costs to Gage, dated June 16, 2023.

Wren advances 37 assignments of error (AOE) grouped according to his different claims. This opinion follows Wren's grouping of AOEs and addresses his assignments of error generally within each grouping.

A.    STANDARDS OF REVIEW

We review a trial court's decision on a CR 50 motion de novo. *Williams v. Dep't of Soc. & Health Servs.*, 24 Wn. App. 2d 683, 697, 524 P.3d 658 (2022). A CR 50 motion is properly granted only when, "'after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party.'" *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021) (quoting *H.B.H. v. State*, 192 Wn.2d 154, 162, 429 P.3d 484 (2018)); *see generally* CR 50. "'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true." *Williams*, 24 Wn. App. 2d at 697.

Parties are entitled to have the jury instructed on their theory of the case if sufficient evidence supports that theory. *State v. Tullar*, 9 Wn. App. 2d 151, 155-56, 442 P.3d 620 (2019). We review jury instructions de novo if based upon a matter of law or for abuse of discretion if based upon a matter of fact. *Kappelman*, 167 Wn.2d at 6.

Juries determine questions of fact, and the amount of damages that should be awarded to a party is a question of fact. *Bunch v. King County Dep't of Youth Servs.*, 155 Wn.2d 165, 179, 116 P.3d 381 (2005). "We strongly presume the jury's verdict is correct." *Id.* We will not disturb a jury award of damages "'unless it is outside the range of substantial evidence in the record, or

shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.'" *Id.* (quoting *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985)).

We review a trial court's evidentiary rulings for abuse of discretion. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 728, 315 P.3d 1143 (2013), *review denied*, 180 Wn.2d 1011 (2014). Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. ER 402. Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

"[W]e will overturn the trial court's ruling on the admissibility of evidence only if its decision was manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons." *Gregg Roofing*, 178 Wn. App. at 728. If a trial court makes an erroneous evidentiary ruling, appellate courts assess whether the error was prejudicial. *Id.* at 728-29. "'[E]rror without prejudice is not grounds for reversal.'" *Id.* (quoting *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)). An error is prejudicial only if it affects the outcome of a case. *Id.* at 729.

B.  DEFAMATION (AOE 1-13)

Wren argues that the trial court erred when it failed to grant Wren's CR 50 motion to dismiss Gage's defamation claim, and moreover, the jury's defamation finding and ultimate defamation judgment were unsupported by substantial evidence. Additionally, Wren argues that the trial court erred when it instructed the jury on defamation and in excluding evidence relevant to Wren's defense.

1.      Legal Principles

a.      Defamation

In claims of defamation, an individual must prove falsity, an unprivileged communication, fault, and damages. *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34, 43-44, 108 P.3d 787 (2005). A defamation claim must be based on a statement that is provably false. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998). If a statement is false in part, but not in whole, it still satisfies the falsity element. *Id.* at 593.

Moreover, "[t]he alleged defamatory statement must be a statement of fact, not a statement of opinion." *Life Designs Ranch, Inc. v. Sommer*, 191 Wn. App. 320, 330, 364 P.3d 129 (2015), *review denied*, 185 Wn.2d 1022 (2016). The line between opinion and fact may be blurry, so to assess whether a statement is actionable, courts consider "'(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.'" *Id.* (internal quotation marks omitted) (quoting *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 365, 287 P.3d 51 (2012)); *accord Schmalenberg*, 87 Wn. App. at 590-91 ("A defamation claim must be based on a statement that is provably false. A statement meets this test to the extent it falsely expresses or implies provable facts, regardless of whether the statement is, in form, a statement of fact or a statement of opinion. A statement does not meet this test to the extent it does not express or imply provable facts." (Footnotes omitted.)).

Additionally, courts consider whether the defamed individual is a public figure or a private figure. *Maison de France*, 126 Wn. App. at 44. When a person is a public figure, he or she must

establish actual malice. *Id.* Actual malice is established when the speaker has knowledge of the falsity of their statement or has reckless disregard for the truth or falsity of the statement. *Id.*

If the defamed individual is a private figure, he or she need only establish negligence. *Id.* "'The negligence standard is that the defendant knew or, in the exercise of reasonable care, should have known that the statement was false or would create a false impression in some material respect.'" *Id.* (quoting *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675, 680, 713 P.2d 736, *review denied*, 105 Wn.2d 1016 (1986)). "When the standard of fault is negligence, the applicable burden of proof is preponderance of the evidence." *Momah v. Bharti*, 144 Wn. App. 731, 741, 182 P.3d 455 (2008), *review granted and case dismissed*, 165 Wn.2d 1027 (2009).

If a plaintiff establishes a prima facie case of defamation, a defendant may raise an absolute or qualified privilege defense to avoid liability. *Id.* "The defense of absolute privilege applies to statements made in the course of judicial proceedings and avoids all liability." *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 475, 564 P.2d 1131 (1977).

> Absolute privilege is usually confined to cases in which the public service and administration of justice require complete immunity. Legislatures in debate, judges and attorneys in preparation or trial of cases and executive or military personnel, when within the duties of their offices, are frequently cited examples. In such situations the utterances or publications of such individuals, even though false or malicious, are protected. . . .
>
> . . . In addition, the scope of absolute privilege has traditionally been limited to situations in which authorities have the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct.

*Id.* at 476.

A qualified privilege to make a defamatory statement, unlike an absolute privilege, "'may be lost if it can be shown that the privilege has been abused.'" *McNamara v. Koehler*, 5 Wn. App.

2d 708, 715, 429 P.3d 6 (2018) (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 600, 664 P.2d 492 (1983)), *review denied*, 192 Wn.2d 1021 (2019). A qualified privilege may apply in circumstances where

> communication need not be true, if published without malice, in good faith, and in an honest belief of their truth arrived at after a fair and impartial investigating or upon reasonable grounds for such belief. These occasions arise when the publication is for the protection of the interest of the publisher, the recipient or a third person, persons sharing a common interest, family relationships, [or] public interest.

*Twelker*, 88 Wn.2d at 478 (internal citations omitted) (quoting *Owens v. Scott Publ'g Co.*, 46 Wn.2d 666, 674, 284 P.2d 296 (1955), *cert. denied*, 350 U.S. 968 (1956)). A showing of actual malice will defeat qualified privilege. *Momah*, 144 Wn. App. at 742.

### b. Defamation per se

A communication may constitute defamation per se if it "'(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.'" *Life Designs Ranch*, 191 Wn. App. at 328 (quoting *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of Am.*, 100 Wn.2d 343, 353, 670 P.2d 240 (1983)). In such cases, a plaintiff need not prove damages. *Maison de France*, 126 Wn. App. at 44.

Juries typically decide what constitutes defamation per se. *Life Designs Ranch*, 191 Wn. App. at 328. "Truth is an absolute defense to a per se defamatory statement." *Maison de France*, 126 Wn. App. at 45.

2.       No Error in Denial of Wren's CR 50 Motion

Wren argues that the trial court erred when it failed to grant Wren's CR 50 motion and dismiss Gage's defamation claim against him. Specifically, Wren argues that Gage failed to prove that (1) Wren's statements were false, (2) Wren's statements were statements of fact as opposed to opinion, and (3) Wren had knowledge of or reckless disregard for the falsity of his statements. In addition, Wren argues that both absolute privilege and qualified privilege applied to Wren's statements. We disagree.

Near the end of trial, Wren submitted a CR 50 motion to dismiss Gage's claim of defamation. In his motion, Wren specifically argued that either absolute privilege or qualified privilege applied to his alleged defamatory statements. Furthermore, Wren argued that Gage failed to demonstrate any actual malice on the part of Wren.

A CR 50 motion is properly granted only when, viewing evidence in a light most favorable to the nonmoving party, there is no substantial evidence or reasonable inference that arises to support a verdict for the nonmoving party. *Mancini*, 196 Wn.2d at 877. Thus, viewing the evidence in a light most favorable to Gage, the trial court should only have granted Wren's CR 50 motion to dismiss Gage's defamation claim if *nothing* in the record could possibly support Wren's potential liability for defamatory statements based on the application of absolute or qualified privilege.

Here, the record shows that Wren proactively sent copies of his *draft* complaint, *prior* to its filing, accompanied by text and email communications related to the allegations in the draft complaint, to several individuals in the Lake Tapps community and automobile industry. None of

the recipients of Wren's messages had any relation to the lawsuit nor would have had any reason to know of Wren's allegations absent Wren's communications with them.

Viewing the evidence in a light most favorable to Gage, Wren's texts implied that Gage had engaged in criminal conduct. For example, in August 2019, which was several months before Wren filed his complaint, Wren texted Ford, the father of Gage's childhood best friend, and implied that Gage was making false claims for cars by writing: "We found payment of almost all cars Gage claims as coming from our checkbook." Ex. 520, at 3. In the context of the text string, this statement implies that Gage was falsely claiming the cars belonged to him but there is a record that Gage did not pay for the cars. In September 2019, Wren texted Kriens: "Had to hire a private investigator in [C]anada. Forensic accountant. Crime related litigator. Handwriting expert. . . . [Butch is] going to put himself *and his son* in jail. We are waiting for the Puyallup police to make a decision on the fraud[,] embezzlement[,] and forgery issues." Ex. 523, at 1 (emphasis added). This text clearly implies that Gage was involved in criminal activity including fraud, embezzlement, and forgery. In December 2019, Wren requested that Schaefer read the draft complaint, which named Gage as a defendant and alleged multiple allegations of criminal conduct by Gage, and to show the draft complaint to a friend at the Puyallup police department.

Also, it is clear from the content and recipients of these communications that neither absolute privilege nor qualified privilege apply. "The defense of absolute privilege applies to statements made in the course of judicial proceedings and avoids all liability." *Twelker*, 88 Wn.2d at 475. Wren's statements were made outside judicial proceedings—before any complaint was filed. Wren has not cited to any cases where absolute privilege has been extended to statements made prior to a complaint being filed. Moreover, Wren was not a participant in a legislative debate,

nor was he a judge or attorney preparing for trial, or military personnel acting within the duty of his office. *Id.* at 476.

As to qualified privilege, Wren argues his communications were to protect himself, to protect those sharing a common interest, for the protection of family relationships, and for the protection of public interest. However, even if Wren had an honest and good faith belief that Gage participated in fraud, embezzlement, forgery, and a widespread criminal conspiracy, Wren fails to articulate how he shared a common interest, family interest, or protected the public interest through his communications with individuals who were not otherwise involved with Gage.

We view the evidence and reasonable inferences from the evidence in a light most favorable to Gage. *Mancini*, 196 Wn.2d at 877. Based on the nature of Wren's communications about Gage; evidence that Wren shared copies of the unfiled, draft complaint, along with statements made to individuals in Gage's community and in the auto industry implicating Gage in criminal conduct; and because evidence was presented that show neither privilege applies to Wren's communications to Ford, Schaefer, and Kriens, the trial court did not err when it denied Wren's CR 50 motion to dismiss Gage's defamation claim and allowed the claim to be decided by the jury.[18]

3.    Jury Properly Instructed on Defamation

Wren argues that the trial court erred when it failed to properly instruct the jury on defamation, either through inclusion of certain instructions or exclusion of Wren's proposed instructions or special verdict questions (SVQs).

---

[18]   We emphasize that we do not address whether circulating a filed complaint, which at that point is in the public record, could support a defamation claim.

a.     Instruction 16

Wren challenges the opening sentences of instruction 16. Instruction 16 states, in relevant part: "Gage Whitehead alleges that Mr. Wren defamed him. Defamation involves a false statement that injures a third party's reputation." CP (58272-4-II) at 3136. Instruction 16 then provides the elements of defamation and defamation per se. Wren argues that the trial court should have included language that statements of opinion cannot be defamatory as a matter of law. Because Wren's challenge to instruction 16 is a legal one, we review instruction 16 de novo. *Kappelman*, 167 Wn.2d at 6.

Here, Wren asserts that statements of opinion are not defamatory as a matter of law. However, an opinion may be actionable if it "falsely expresses or implies provable facts." *Schmalenberg*, 87 Wn. App. at 590. A court must assess the context of a statement and its publication, the audience, and whether statement implies otherwise unknown facts. *Life Designs Ranch*, 191 Wn. App. at 330. Thus, it would have been a misstatement of the law for the trial court to include the sentence, "'Statements of opinion are not actionable,'" as Wren proposed. Amend. Br. of Appellant (58272-4-II) at 44.

The record suggests that to the extent any of Wren's statements were opinions, those opinions still implied provable facts. Accordingly, the distinction between "statement of fact" and "statement of opinion" is superfluous in this circumstance. The trial court arrived at the same conclusion based on the evidence presented during trial: "In the context of the evidence in this case, I don't think that distinction applies, so we will leave the false statement of fact out and just make it false statement." 11 VRP (Mar. 13, 2023) at 1335. The trial court did not err in giving instruction 16.

b.      Instruction 18 and proposed instruction 55

Wren argues the trial court erred when it gave instruction 18 and failed to give Wren's

proposed instruction 55.

Instruction 18 states:

> The Wrens have a qualified privilege for defamatory statements (1) made
> to Kenneth Brautigan; (2) made to the Wrens' investigator in British Columbia and
> investigator in Arizona while investigating the facts of the case; (3) made when
> communicating directly with the police to file a police report; and (4) made when
> communicating with car dealerships when trying to recover, locate, or obtain
> documents on vehicles in dispute.  Those dealerships include Sunset Cars of
> Auburn and Northwest Motor Sport[.]
>
> With respect to defamatory statements that are subject to a qualified
> privilege, the burden of proof shifts to the [sic] Gage Whitehead to demonstrate
> abuse of that qualified privilege.  A showing of actual malice will defeat a qualified
> privilege.
>
> Actual malice must be shown by clear and convincing proof of Kenneth
> Wren's knowledge or reckless disregard as to the falsity of a statement.
>
> The filing in the superior court of the complaint, or the amended complaint,
> is covered by the absolute privilege.

CP (58272-4-II) at 3138.

Wren's proposed instruction 55 states:

> If you find that Gage Whitehead has established a prima facie case of
> defamation, the Wrens have raised both an absolute and a qualified privilege to
> defend against liability for defamatory statements.  An absolute privilege or
> immunity absolves the Wrens of all liability for defamatory statements. A qualified
> privilege, on the other hand, may be lost if it can be shown that the privilege has
> been abused.
>
> The Court has determined that both the absolute and qualified privileges
> apply, with the absolute privilege applying to statements made after this lawsuit
> was filed on January 17, 2020, and the qualified privilege applying to statements
> made prior to January 17, 2020.  You are accordingly instructed to weigh the

evidence related to allegedly defamatory statements to only those statements made prior to January 17, 2020.

Because the Wrens are entitled to assert the qualified privilege to allegedly defamatory statements made prior to January 17, 2020, the burden of proof shifts to the [sic] Gage Whitehead to demonstrate abuse of that qualified privilege. A showing of actual malice will defeat a qualified privilege.

Actual malice must be shown by clear and convincing proof of Kenneth Wren's knowledge or reckless disregard as to the falsity of a statement.

CP (58272-4-II) at 2991. Wren challenges instruction 18's "limitation to 4 discrete categories of communication" and argues that his proposed instruction 55, which did not contain that limitation, was more appropriate. Amend. Br. of Appellant (58272-4-II) at 47.

We note that Wren fails to propound any substantive argument as to why the limitations listed in instruction 18 are erroneous. Instruction 18 identifies circumstances in which qualified privilege and absolute privilege apply and is consistent with case law. *See generally Twelker*, 88 Wn.2d at 476-79.

The application of privilege is a legal determination, to be applied in specific cases. *Id.* Wren's proposed instruction 55 is highly general. For instance, the statement, "The Court has determined that both the absolute and qualified privileges apply, with the absolute privilege applying to statements made after this lawsuit was filed on January 17, 2020, and the qualified privilege applying to statements made prior to January 17, 2020" is so generalized that it risks misapplication of the law because it disregards to whom the statement was made or in what context. CP (58272-4-II) at 2991.

Also, Wren's proposed instruction 55 misconstrues what the trial court actually determined. The trial court engaged in an extended colloquy with counsel over the application of privilege to Gage's defamation claim. Ultimately, the trial court stated:

> There are certainly entities to whom the qualified privilege would apply, as between the parties, Sunset Chevrolet, perhaps, because that was a potential outlet for—that was known to be involved in these sales.
>
> If you want to put together an instruction on qualified immunity that is limited to those individuals, I think that that would be appropriate.
>
> But just to say that there's qualified immunity, and then allow the jury to speculate, "Well, maybe that just applies to everybody," that is not the law.
>
> That's where I come down on it. I just don't see how Gage Whitehead's lifelong friends and neighbors who have had this information published to them are covered in any way by a qualified immunity.

10 VRP (Mar. 10, 2023) at 1302. Furthermore, Wren fails to argue how *all* statements Wren made to *any* individual after January 17, 2020 qualify for absolute privilege and *all* statements made prior to January 17, 2020 qualify for qualified privilege such that proposed instruction 55 is an accurate statement of the law.

Because instruction 18 correctly states the law on privilege and because proposed instruction 55 incorrectly states the law, the trial court did not err in rejecting Wren's proposed instruction 55 and giving instruction 18.

        c.        Proposed special verdict questions 55 and 56

Wren argues the trial court erred when it failed to give proposed SVQs 55 and 56 because those proposed SVQs would have ensured "the jury actually identified a false statement of fact that was not privileged and that was heard by a third party who understood it in its defamatory sense." Amend. Br. of Appellant (58272-4-II) at 46.

Proposed SVQ 55 and SVQ 56 state:

(Note: Because he seeks presumptive damages, and because Kenneth Wren is entitled to a qualified privilege, David Gage Whitehead has the burden of proving his defamation claim to the actual malice standard.)

Question 55: Did Kenneth Wren make a false statement of fact about Gage Whitehead?

. . . .

Question 56: What was Kenneth Wren's false statement of fact about Gage Whitehead, when did he say it, and who did he say it to?

CP (58272-4-II) at 3083-84.

Here, Wren's proposed SVQs 55 and 56 are premised upon his argument that statements of opinion are not actionable. The jury did not need to identify a false statement of *fact*; rather, it needed to identify actionable false statements, whether in the form of a statement of fact or opinion. *Schmalenberg*, 87 Wn. App. at 590-91; *Life Designs Ranch*, 191 Wn. App. at 330. For that reason alone, Wren's proposed SVQs 55 and 56 are misleading.

Additionally, the jury was instructed on qualified privilege and absolute privilege in instruction 18, discussed further below, and the circumstances in which those privileges applied. "We presume that jurors follow instructions." *Spivey v. City of Bellevue*, 187 Wn.2d 716, 737, 389 P.3d 504 (2017). Instruction 18 would obviate the need for proposed SVQ 56. Furthermore, "[t]he jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient." *Schmalenberg*, 87 Wn. App. at 600 n.58.

Moreover, proposed SVQs 55 and 56 suggest that Gage must prove actual malice in every circumstance in order to prevail on his defamation claim. This is an incorrect statement of the law, particularly as not all of Wren's statements were necessarily subject to privilege. Indeed, Wren's

47

proposed SVQs 55 and 56 altogether ignore defamation per se, which the jury was instructed on in instruction 16. Thus, because Wren's proposed SVQs 55 and 56 are misleading in the context of the jury instructions as a whole, the trial court did not err when it declined to give the proposed SVQs.

> 4. No Evidentiary Error

Wren argues that the trial court erred by "concluding that Butch was not Gage's agent and co-conspirator, and that the bankruptcy stay prevented submission of evidence to the jury of Butch's thefts, embezzlements and forgery, all of which were relevant to Wren's defense of Gage's defamation claim." Amend. Br. of Appellant (58272-4-II) at 48. Wren asserts that had he been able to introduce evidence of *Butch's* forgery, fraud, and embezzlement, it "would have informed the jury that Wren's supposedly false statements of fact were nothing of the sort, but in fact were true." Amend. Br. of Appellant (58272-4-II ) at 51. We disagree.

Wren fails to show how evidence of Butch's conduct is of consequence to whether Wren defamed *Gage*. Only relevant evidence is admissible. ER 402. Relevant evidence is any evidence that has a "tendency to make the existence of any fact that is *of consequence to the determination of the action* more probable or less probable than it would be without the evidence." ER 401 (emphasis added).

Here, to the extent evidence of Butch's conduct makes Wren's statements true, they would only be true insofar as they pertained to *Butch*. Wren fails to argue how evidence of Butch's conduct makes Wren's statements about *Gage* true. Moreover, Wren fails even to identify what "supposedly false statements of fact" about *Gage* that would have been rendered true through evidence of Butch's conduct. Because Wren fails to articulate how evidence of Butch's conduct

is relevant to Gage's defamation claim, the trial court did not err when it excluded evidence of Butch's conduct.[19]

5.      Sufficient Evidence Supports Jury Verdict

Wren argues that insufficient evidence supported the jury's defamation verdict against him. Specifically, Wren contends that his statements that Gage stole from him were true, particularly in light of the fact that the jury found that Gage converted the truck, boat, and trailer.

To prevail on a defamation claim, Gage needed to demonstrate falsity, an unprivileged communication, fault, and damages. *Maison de France*, 126 Wn. App. at 43-44. Furthermore, a communication may constitute defamation per se if it deprives a person "'of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.'" *Life Designs Ranch*, 191 Wn. App. at 328 (quoting *Caruso*, 100 Wn.2d at 353). "'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true." *Williams*, 24 Wn. App. 2d at 697.

---

[19] As part of Wren's challenge to the trial court's evidentiary decision regarding Butch's conduct, Wren assigns error to the trial court's rejection of his proposed instructions 48, 49, and 25. Specifically, Wren asserts that in order to have been able to argue his "defense theory" that his statements were true and "for the jury to understand it," the jury "needed access" to instructions on the WCPA. Amend. Br. of Appellant (58272-4-II) at 52. Proposed instructions 48 and 49 provide definitions found within the WCPA. Proposed instruction 25 provides the definition of "theft" as found in RCW 9A.56.020.

Wren provides no argument as to how or why the trial court erred in rejecting these instructions or how rejection of those instructions prevented him from presenting a defense that his statements about Gage were true. We need not address claims of errors unsupported by argument, and accordingly, decline to address Wren's assignments of error to the rejection of proposed instructions 25, 48, and 49. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Gage is a private individual; thus, Gage needed only to establish negligence on Wren's part as to degree of fault—meaning Wren knew or should have known that his statements were false or would create a false impression. *Maison de France*, 126 Wn. App. at 44. Negligence is established by a preponderance of the evidence. *Valdez-Zontek v. Eastmont School Dist.*, 154 Wn. App. 147, 157, 225 P.3d 339 (2010).

Respect for the jury's role in our civil justice system is rooted in Washington's constitution, which grants juries "the ultimate power to weigh the evidence and determine the facts—and the amount of damages in a particular case is an ultimate fact." *James v. Robeck*, 79 Wn.2d 864, 869, 490 P.2d 878 (1971) (citing WASH. CONST. art. I, § 21). A jury verdict will be overturned "only when it is clearly unsupported by substantial evidence." *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994). An appellate court

> "will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. The inferences to be drawn from the evidence are for the jury and not for [an appellate court]. *The credibility of the witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.*"

*Id*. (citation omitted) (quoting *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)).

Wren argues that Gage failed to prove falsity because Wren's statements were "true" because there was evidence that the knowledge possessed by Gage was that the property Gage took belonged to Wren. Amend. Br. of Appellant (Wren Appeal) at 39-40. Essentially, Wren asks us to reweigh the evidence presented to the jury to overturn the jury verdict. But "[w]e do not

reweigh conflicting evidence or otherwise disturb the jury's determinations as to the persuasiveness of the evidence or credibility of witnesses." *Valdez-Zontek*, 154 Wn. App. at 158.

As discussed above, Wren's argument is premised upon the idea that only statements of fact are actionable, so Wren only identifies and argues about whether his statements that Gage stole from him were defamatory. However, as also discussed above, the record shows that prior to filing a complaint against Gage, Wren made statements to Ford, Kriens, and Schaefer, individuals in the auto industry and in the Lake Tapps community, implying fraud, embezzlement, and forgery by Gage. The record also shows that Wren shared with Schaefer a *draft* complaint against Gage that contained allegations of fraud, embezzlement, forgery, and criminal conspiracy. Without Wren's statements and sharing of the draft complaint, these individual had no reason to be aware of Wren's allegations.

During trial, Gage testified he no longer has contact with friends he has had since childhood, he is no longer invited to the same social gatherings, and he must conduct his consignment business with individuals and companies over 100 miles away from his home. Indeed, based on Gage's trial testimony, Wren's statements can be construed as defamatory per se because the statements exposed Gage to contempt, ridicule or obloquy, "'depriv[ing] him of the benefit of public confidence or social intercourse," and they "'injure[d] him in his business, trade, profession or office.'" *Life Designs Ranch*, 191 Wn. App. at 328 (quoting *Caruso*, 100 Wn.2d at 353). Based on the foregoing, sufficient evidence supports the jury's finding that Wren defamed Gage.

With regard to damages, we will not disturb a jury award of damages "'unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to

have been arrived at as the result of passion or prejudice.'" *Bunch*, 155 Wn.2d at 179 (quoting *Bingaman*, 103 Wn.2d at 835). In light of Gage's youth, along with his lost business and social relationships, nothing suggests that the jury's award of $403,166 is outside the range of substantial evidence in the record, arrived at as a result of passion or prejudice, nor does it shock the conscience.

C.     CRIMINAL PROFITEERING (AOE 14-17)

Wren argues that the trial court erred when it dismissed Wren's claims against Gage for violation of the WCPA. Specifically, Wren asserts that Gage's "thefts" of the truck, boat, and trailer constitute predicate acts in a "pattern of criminal profiteering activity involving theft, forgery, and money laundering of vehicles and cash." Amend. Br. of Appellant (58272-4-II) at 54. Wren also argues that the trial court erred when it "rejected the clear evidence . . . that Butch was Gage's agent." Amend. Br. of Appellant (58272-4-II) at 54. We disagree.

1.     Legal Principles

The WCPA is Washington's version of the federal Racketeer Influenced Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-1968, and is known as a "'little RICO'" statute. *See Winchester v. Stein*, 135 Wn.2d 835, 848, 959 P.2d 1077 (1998); *Rice v. Janovich*, 109 Wn.2d 48, 55, 742 P.2d 1230 (1987). The purpose of the WCPA is, in part, to combat organized crime and provide civil remedies to violations of the Act. *Winchester*, 135 Wn.2d at 849; *accord Barkley v. GreenPoint Mortg. Funding, Inc.*, 190 Wn. App. 58, 69, 358 P.3d 1204 (2015) ("This act provides a civil cause of action to a person if injured in his or her 'person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity, or by an

offense defined in [several criminal statutes].'" (alterations in original) (quoting RCW 9A.82.100(1)(a))), *review denied*, 184 Wn.2d 1036 (2016); *see generally* RCW 9A.82.100.

Under RCW 9A.82.010(4), "'[c]riminal profiteering'" includes several enumerated offenses. Those offenses include forgery, theft, trafficking in stolen property, money laundering, theft with intent to resell, and organized retail theft. RCW 9A.82.010(4)(d), (e), (r), (t), (oo), (pp). To constitute a "'[p]attern of criminal profiteering,'" an individual must engage "in at least three acts of criminal profiteering" and "the three acts must have the same or similar intent, results, accomplices, principals, victims, or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events." RCW 9A.82.010(12). RCW 9A.82.100(1)(a) provides that a "person who sustains injury to his or her person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity . . . may file an action in superior court for the recovery of damages and the costs of the suit, including reasonable investigative and attorney's fees."

Because the WCPA is similar to the federal RICO statute, courts may look to federal case law for guidance when construing the WCPA. *Winchester*, 135 Wn.2d at 848. The Ninth Circuit Court of Appeals has stated that the "pattern" requirement for "can be met by showing (1) 'that the racketeering predicates are related,' and (2) that the predicates 'amount to or pose a threat of continued criminal activity.'" *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1138 (9th Cir. 1993) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)); *accord Attia v. Google LLC*, 983 F.3d 420, 427 (9th Cir. 2020); *Kan-Di-Ki, LLC v. Sorenson*, 723 Fed. Appx. 432, 434 (9th Cir.), *cert. denied*, 139 S. Ct. 199 (2018). Furthermore, isolated or sporadic events cannot constitute a "pattern." *Durning*, 990 F.2d at 1138.

2.      Wren Fails to Establish Pattern of Criminal Profiteering[20]

The record shows that in July 2019, Butch and Gage had possession of the truck, boat, and trailer. The record also shows that the truck, boat, and trailer were among the assets listed on the bill of conveyance and that Brautigan transferred title of those vehicles to Wren. Butch and Gage took the truck, boat, and trailer to Arizona without permission and failed to respond to requests to return them.

Here, even if Gage admitted to theft of the truck, boat, and trailer, there is nothing in the record suggesting that Gage's conduct constituted a *pattern* that "'amount[ed] to or pose[d] a threat of *continued criminal activity*.'" *Attia*, 983 F.3d at 427 (emphasis added) (quoting *H.J. Inc.*, 492 U.S. at 239). The act of taking the truck, boat, and trailer was a single, isolated incident. An isolated incident cannot constitute a pattern. *Durning*, 990 F.2d at 1138. The record suggests that one vehicle could not have been taken without the others—indeed, Butch testified that the truck was needed to pull the boat and trailer. This was simply not a circumstance of three distinct acts, and Wren fails to identify other conduct on Gage's part that amounted to or posed a threat of continued criminal activity. *Attia*, 983 F.3d at 427.

---

[20] Wren assigned error to the trial court's denial of his motion for summary judgment based on a finding that Gage "willfully converted, and thus committed three predicate acts of theft, by absconding to Arizona with Wren's truck, pontoon boat, and trailer." Amend. Br. of Appellant (58272-4-II) at 5. However, in his briefing, Wren appears to argue only about the dismissal of his criminal profiteering claims against Gage generally.

The issue of conversion of the boat, truck, and trailer went to the jury. "[W]e do not review a trial court's denial of a summary judgment after a jury trial under RAP 2.2." *Leitner*, 15 Wn. App. 2d at 18. Thus, this opinion addresses a general challenge to dismissal of the WCPA claims.

Wren argues that there is "clear evidence" that "Butch was Gage's agent," and that it was Butch's conduct that established the pattern of criminal activity. Amend. Br. of Appellant (58272-4-II) at 54. However, nothing in the record demonstrates that Gage and Butch were in a principal-agent relationship or that Gage was a primary actor directing a criminal scheme. Rather, the record shows a young man who relied on his father for assistance in an industry in which his father had experience. Wren does not offer any argument as to why or how Butch was allegedly Gage's agent. We need not address claims unsupported by argument. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Moreover, we decline to impute Butch's conduct onto Gage for the purpose of establishing the "pattern" of criminal activity needed to recover under the WCPA. Because Gage's taking of the truck, boat, and trailer constitute a single, isolated incident, Wren's claims against Gage under the WCPA fail, and the trial court did not err in its dismissal of those claims.

D.     VOIDABLE/FRAUDULENT TRANSFERS, CONVERSION, AND UNJUST ENRICHMENT (AOE 18-22)

Wren argues that the trial court erroneously dismissed his claims against J&N for fraudulent/voidable transfers, conversion, and unjust enrichment. Wren also argues that the trial court erred in dismissing his fraudulent/voidable transfers and replevin claim against Gage based on the trial court's "incorrect conclusion that a claim under RCW 19.40 is no different than a claim for conversion." Amend. Br. of Appellant (58272-4-II) at 61. We disagree.

1.      Legal Principles

Under the UVTA,[21] chapter 19.40 RCW, a transfer made by a debtor is voidable as to a

creditor if the debtor made the transfer:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor;
> or
> (b) Without receiving a reasonably equivalent value in exchange for the
> transfer or obligation, and the debtor:
> (i) Was engaged or was about to engage in a business or a transaction for
> which the remaining assets of the debtor were unreasonably small in relation to the
> business or transaction; or
> (ii) Intended to incur, or believed or reasonably should have believed that
> the debtor would incur, debts beyond the debtor's ability to pay as they became
> due.

RCW 19.40.041(1).

To determine actual intent, courts may consider several enumerated factors, such as

whether the transfer was made to an "insider,"[22] the debtor absconded or removed and concealed

assets, or if the transfer constituted substantially all of the debtor's assets. RCW 19.40.041(2). "A

creditor making a claim for relief under subsection (1) of this section has the burden of proving

the elements of the claim for relief by a preponderance of the evidence." RCW 19.40.041(3).

If a creditor proves the elements of a voidable transfer, the creditor may avoid the transfer

to the extent necessary to satisfy his or her claim, among other remedies. RCW 19.40.071(1); *see*

---

[21] Chapter 19.40 RCW is formerly known as the Uniform Fraudulent Transfer Act (UFTA). In
2017, the legislature amended the UFTA to become the UVTA. S.B. 5085, 65th Legis., Reg. Sess.
(Wash. 2017); RCW 19.40.900. The UVTA applies to transfers made or obligations incurred on
or after July 23, 2017 and the UFTA applies to transfers made or obligations incurred before July
23, 2017. RCW 19.40.905.

[22] An "insider" includes various individuals in certain relationships with the debtor, depending if
the debtor is an individual, a corporation, or a partnership. RCW 19.40.011(8).

*generally* RCW 19.40.081(2). However, a transfer is not voidable "against a person that took in good faith and for a reasonably equivalent value." RCW 19.40.081(1).

An action for conversion involves three elements: "(1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession." *Burton v. City of Spokane*, 16 Wn. App. 2d 769, 773, 482 P.3d 968 (2021); *accord Judkins v. Sadler-MacNeil*, 61 Wn.2d 1, 3, 376 P.2d 837 (1962). Wrongful intent is not an element of conversion, nor is good faith a defense. *Burton*, 16 Wn. App. 2d at 773.

2.      Claims Against J&N

Wren argues that the trial court erred when it granted two separate motions for partial summary judgment dismissing claims against J&N for (1) fraudulent/voidable transfers and (2) conversion and unjust enrichment. Wren contends that the summary judgment dismissal of those claims was improper because "material facts are in dispute." Amend. Br. of Appellant (58272-4-II) at 58. J&N argues that Wren has failed to brief his argument regarding claims against it and that this court should decline to address Wren's arguments. We agree with J&N and decline to address Wren's arguments against J&N.

Wren spends four pages in his opening brief attempting to incorporate hundreds of pages of documents and argument from other briefing, while making conclusory statements about J&N's purported liability and providing no meaningful argument.[23] As J&N aptly states in its brief:

---

[23] We note that Wren's original opening brief, filed December 22, 2023, had 60 assignments of error and a 15,235-word court. In conjunction with the brief, Wren filed a motion to waive the page limitation because "it was not possible to present [the] factual, legal and procedural issues clearly to the Appellate Panel within the typical 12,000-word limit of RAP 18.17(c)(2)." Mot. to File Overlength Br. of Appellant (Dec. 22, 2023) at 4. We granted Wren's motion in part based on the complex procedural history of the case and allowed an overlength brief of 13,200 words. It

> The Wrens do not articulate the legal standards for recovery on any of these claims, the facts supporting any of these claims, or any substantive legal argument for this Court's consideration whatsoever. Instead, they provide offhand reference to hundreds of pages of the trial court record and conclude that the referenced documents resolve the case in their favor, without even stating what those documents are.

Br. of Resp't-J&N (58272-4-II) at 14-15.

It is well established that "argument incorporated by reference to other briefing is not properly before" an appellate court and "[w]e do not permit litigants to use incorporation by reference as a means to argue on appeal or to escape the page limits for briefs set forth in RAP 10.4(b)." *Gamble*, 168 Wn.2d at 180; *Diversified Wood Recycling*, 161 Wn. App. at 890; *accord I.N.A.*, 9 Wn. App. 2d at 426 ("In an appellate court, it is improper to attempt to 'incorporate by reference' into a party's merits brief arguments made in other pleadings . . . Instead, the proper approach is for the attorney to set forth the party's complete argument in the argument section of the merits brief."). Accordingly, we decline to address Wren's arguments against J&N regarding fraudulent/voidable transfers, conversion, and unjust enrichment.

> 3. Fraudulent/Voidable Transfers Claims Against Gage

Wren argues that the trial court effectively and erroneously dismissed his fraudulent/voidable transfer claims against Gage when it refused to instruct the jury on the UVTA "based on the . . . incorrect conclusion that a claim under RCW 19.40 is no different than a claim for conversion." Amend. Br. of Appellant (58272-4-II) at 61.

---

bears noting, however, that our decision to allow an overlength brief was based on the conclusion that "[t]he proposed brief can comply with the word count limit through appellate counsel's *careful winnowing* of the proposed issues and assignments of error *to those most likely to succeed*." Ruling on Mot. to File Overlength Br. of Appellant (Dec. 27, 2023) (emphasis added).

Wren again fails to cite legal authority or substantively argue how the trial court erred in rejecting certain jury instructions. In light of the lack of any meaningful argument, we decline to address Wren's claims. *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

E.     CONSIGNMENT AGREEMENT BETWEEN GAGE AND STANFORD (AOE 23-27)

Wren argues that the trial court erred when it granted partial summary judgment in Gage's favor, finding that Stanford entered into and breached a consignment agreement with Gage. Gage argues that the trial court did not err in granting partial summary judgment finding that Stanford entered into and breached a consignment agreement with Gage. Specifically, Gage asserts that the evidence demonstrates the existence of a consignment agreement and that Brautigan's declarations stating otherwise should not be taken at face value in light of that evidence.

The record shows that Stanford submitted a sworn declaration from Brautigan stating that Stanford did not consign vehicles, did not have the required trust accounts for vehicle consignments, did not carry the proper insurance to consign vehicles, or enter into any consignment agreement with Gage, let alone have a written consignment agreement with Gage. And the record shows that Gage and Stanford never had a consignment agreement in writing. The record also shows that Gage and Stanford engaged in transactions with each other. Thus, while there is extensive evidence that supports the existence of some form of an agreement between Gage and Stanford, there is nothing in the record that shows the existence of a consignment agreement between Gage and Stanford such that the matter could be determined *as a matter of law* on summary judgment.

Moreover, the existence of a consignment agreement is separate from whether that agreement was *breached*. Indeed, while self-serving, Brautigan's assertions that no consignment agreement existed, let alone breached, create a genuine issue of material fact.

"Summary judgment is appropriate *only when no genuine issue exists as to any material fact* and the moving party is entitled to judgment as a matter of law." *Royal Oaks Country Club v. Dep't of Revenue*, 2 Wn.3d 562, 568, 541 P.3d 336 (2024) (emphasis added). Courts must consider evidence in a light most favorable to the non-moving party. *Id.* Here, all evidence and reasonable inferences must be viewed in a light most favorable to Stanford, who was the non-moving party. Additionally, summary judgment should "be denied if the reviewing court is required to consider an issue of credibility." *Fed. Deposit Ins. Corp. v. Uribe, Inc.*, 171 Wn. App. 683, 688, 287 P.3d 694 (2012). Because the record shows that some sort of agreement likely existed, it becomes an issue of credibility as to whether it was a consignment agreement or some other type of agreement. Thus, the trial court erred when it granted partial summary judgment in favor of Gage by finding the existence of a consignment agreement between Gage and Stanford and a breach of that agreement by Stanford.

The trial court's judgment with regard to the 12 disputed vehicles stemmed from its partial summary judgment determination that a consignment contract between Gage and Stanford existed and that Stanford breached that contract. Accordingly, we reverse the judgment awarding Gage the 12 vehicles in dispute and remand for trial the issue of whether a consignment agreement existed between Gage and Stanford and whether that agreement was breached.

F.        APPLICATION OF WASHINGTON'S UCC ARTICLE 9A (AOE 28-34)

Wren argues that the trial court erred when it denied his motion for partial summary judgment regarding the 12 vehicles in dispute (January 2023 Order—12 Vehicles) and in its ultimate application of Washington's UCC Article 9A.  Gage argues that his alleged consignment arrangement falls outside the UCC and that Washington's Article 9A of the UCC does not apply. We agree with Gage.[24]

1.        Legal Principles

The legal owner of a motor vehicle is a "a person having a security interest in a vehicle perfected in accordance with chapter 46.12 RCW or the registered owner of a vehicle unencumbered by a security interest."  RCW 46.04.270.  Under RCW 46.12.520(2), "[a] security interest in a vehicle held as inventory by a . . . dealer[25] must be perfected as described in chapter 62A.9A RCW."  Chapter 62A.9A is Washington's adoption of the UCC's Article 9 pertaining to secured transactions.  *See* RCW 62A.9A-101.

---

[24] Even though we are reversing the trial court's grant of summary judgment regarding the existence and breach of a consignment agreement, we address this issue because it may arise on remand.

[25] A "vehicle dealer" is

> any person, firm, association, corporation . . . engaged in the business of buying, selling, listing, exchanging, offering, brokering, leasing with an option to purchase, auctioning, soliciting, or advertising the sale of new or used vehicles, or arranging or offering or attempting to solicit or negotiate on behalf of others, a sale, purchase, or exchange of an interest in new or used motor vehicles, irrespective of whether the motor vehicles are owned by that person.

RCW 46.70.011(17).

The Washington UCC is liberally construed and applied to promote the underlying purposes and policies of the UCC, which is in part to "make uniform the law among the various jurisdictions." RCW 62A.1-103(a)(3).

Article 9A of the Washington UCC applies to certain consignments. RCW 62A.9A-109(a)(4). Under Washington's UCC Article 9A, a "consignment" means

> a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
> (A) The merchant:
> (i) Deals in goods of that kind under a name other than the name of the person making delivery;
> (ii) Is not an auctioneer; and
> (iii) Is not generally known by its creditors to be substantially engaged in selling the goods of others;
> (B) With respect to each delivery, the aggregate value of the goods is one thousand dollars or more at the time of delivery;
> (C) The goods are not consumer goods immediately before delivery; and
> (D) The transaction does not create a security interest that secures an obligation.

RCW 62A.9A-102(a)(20).

A "consignor" is a person who "delivers goods to a consignee in a consignment." RCW 62A.9A-102(a)(21). A consignor is considered a secured party. RCW 62A.9A-102(a)(73)(C). A "consignee" is "a merchant[26] to which goods are delivered in a consignment." RCW 62A.9A-102(a)(19).

---

[26] A "merchant" is

> a person who deals in goods of the kind or otherwise by his or her occupation holds himself or herself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or broker or other intermediary who by his or her occupation holds himself or herself out as having such knowledge or skill.

For the purposes of determining the rights of a consignee's creditors, "while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." RCW 62A.9A-319(a). However,

> [f]or purposes of determining the rights of a creditor of a consignee, law other than this Article determines the rights and title of a consignee while goods are in the consignee's possession if, under this part, a perfected security interest held by the consignor would have priority over the rights of the creditor.

RCW 62A.9A-319(b).

A consignor's security interest in consignment goods "is a purchase-money security interest in inventory." RCW 62A.9A-103(d). If a person files a financing statement

> with respect to a purchase-money security interest before or within twenty days after the debtor receives delivery of the collateral, the security interest takes priority over the rights of a buyer, lessee, or lien creditor which arise between the time the security interest attaches and the time of filing.

RCW 62A.9A-317(e).

Generally, conflicting perfected security interests "rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected, if there is no period thereafter when there is neither filing nor perfection." RCW 62A.9A-322(a)(1). A perfected security interest takes priority over a conflicted unperfected security interest. RCW 62A.9A-322(a)(2).

2. January 2023 Partial Summary Judgment Order—12 Vehicles

Wren argues the trial court erred when it denied his motion for partial summary judgment to enforce his perfected security interests in the 12 vehicles in dispute. Specifically, Wren asserts

---

RCW 62A.2-104(1).

that he established that the 12 vehicles were all bought by Stanford and that his UCC financing statement gives him priority interest in Stanford's collateral, which included those 12 vehicles.

Here, again, Wren fails to provide any legal argument regarding the trial court's denial of his motion for partial summary judgment. Instead, he attempts to incorporate briefing to the trial court and makes conclusory statements as to why Washington's UCC Article 9A should apply. As previously stated, "argument incorporated by reference to other briefing is not properly before" an appellate court and "[w]e do not permit litigants to use incorporation by reference as a means to argue on appeal or to escape the page limits for briefs set forth in RAP 10.4(b)." *Gamble*, 168 Wn.2d at 180; *Diversified Wood Recycling*, 161 Wn. App. at 890. Thus, we decline to address Wren's assignment of error to the trial court's denial of his motion for partial summary judgment regarding the 12 vehicles in dispute.

3.     Applicability of Washington's UCC Article 9A

Wren next argues that the trial court erred in its failure to give jury instructions that applied Washington's UCC Article 9A. Gage argues that his consignment vehicles fall outside Washington's UCC Article 9A and as such, he was not required to file a financing statement or provide notice of his consignment interest. Gage contends that he simply needed to demonstrate that Wren was aware Stanford was substantially engaged in selling consigned goods, and moreover, the jury found that Wren was aware of that fact.

Because evidence in the record supports a determination that Wren was generally aware that Stanford was substantially engaged in selling the goods of others, we hold that the trial court did not err determining that Washington's UCC Article 9A did not apply.

64

a.        Consignments and priority under Washington's UCC Article 9A

For Washington's UCC Article 9A to apply here, the following definition of "consignment" must be met:

> a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
>    (A) The merchant:
>    (i) Deals in goods of that kind under a name other than the name of the person making delivery;
>    (ii) Is not an auctioneer; and
>    (iii) *Is not generally known by its creditors to be substantially engaged in selling the goods of others*;
>    (B) With respect to each delivery, the aggregate value of the goods is one thousand dollars or more at the time of delivery;
>    (C) The goods are not consumer goods immediately before delivery; and
>    (D) The transaction does not create a security interest that secures an obligation.

RCW 62A.9A-102(a)(20) (emphasis added).

If the transaction meets the definition of a "consignment" under the Washington's UCC Article 9A, then the priority between a consignor and the consignee's creditor is determined under Washington's UCC Article 9A.  However, there is no Washington statute or case that addresses the priority of interests between a consignor and the creditor of the consignee when a consignment does not fall within the definition of "consignment" in Washington's UCC Article 9A.

Other jurisdictions provide guidance in such circumstances.  Other jurisdictions have held that when a consignment falls outside UCC Article 9,[27] the priority rules of Article 9 do not apply. *See, e.g.*, *Fariba v. Dealer Servs. Corp.*, 178 Cal. App. 4th 156, 167, 100 Cal. Rptr. 3d 219 (2009);

---

[27] Washington's UCC Article 9A, which addresses secured transactions, is Washington's adoption of the UCC Article 9.  *See* ch. 62A.9A RCW; U.C.C. art. 9 (AM. L. INST. & UNIF. L. COMM'N 1998).

*Belmont Int'l, Inc. v. Am. Int'l Shoe Co.*, 313 Or. 112, 120, 831 P.2d 15 (1992). Instead, other jurisdictions have focused on notice to the consignee's creditor to avoid "secret liens where a creditor of the consignee does not know the consignee does not own the consigned merchandise." *Fariba*, 178 Cal. App. 4th at 166.

For instance, California's UCC Article 9 requires a consignor to file a financing statement to perfect his or her security interest, otherwise the consigned goods are subject to the claims of a consignee's creditors. *Id.* at 166-67; *see generally* CAL. COM. CODE § 9319 (West 2001). However, like Washington's UCC Article 9A, California's UCC Article 9 definition of "consignment" excludes circumstances where "the consignee is 'generally known' by its creditors to be substantially engaged in selling the goods of others." *Fariba*, 178 Cal. App. 4th at 165 (quoting CAL. COM. CODE § 9102(a)(20)(a) (West 2024)). California courts have interpreted this to mean that if the consignee is known to be substantially engaged in consignments, those goods are not subject to the claims of a consignee's creditors—even if the creditor has a perfected security interest. *Id.*

The burden is on the consignor to prove the two elements of the notice exception: (1) that the consignee is substantially engaged in selling the goods of others and (2) that the creditors generally know this is the case. *In re Valley Media, Inc.*, 279 B.R. 105, 124 (Bankr. D. Del. 2002). Both prongs must be satisfied to avoid application of UCC Article 9. *Id.* at 125. "In order to be 'substantially engaged' in selling the goods of others, a merchant must not hold less than 20% of the value of its inventory on a consignment basis." *Id.*; *accord In re TSAWD Holdings, Inc.*, 601 B.R. 599, 606 (Bankr. D. Del. 2019) ("The minimum threshold for substantial engagement is 20% of consigned goods.").

Washington's UCC Article 9A definition of consignment mirrors other jurisdictions' UCC Article 9 definitions of "consignment" where courts have held that subsection (A)(iii) creates an exception when a creditor is generally aware that a merchant is substantially engaged in selling the goods of others. *See, e.g.*, CAL. COM. CODE § 9102(a)(20) (West 2024); *Fariba*, 178 Cal. App. 4th at 167; *Valley Media*, 279 B.R. at 123. One of the primary purposes in Washington's adoption of the UCC is to "make uniform the law among the various jurisdictions." RCW 62A.1-103(a)(3). Thus, consistent with other jurisdictions, it is reasonable for us to interpret Washington's UCC Article 9A's definition of consignment to hinge, in part, on an issue of notice. Therefore, because Washington's UCC Article 9A contains the same definitional language for "consignments" in jurisdictions where such a notice exception is accepted, we adopt the same general notice exception.

> b.      Declining to give Washington's UCC Article 9A jury instructions

The trial court declined to give Wren's proposed jury instruction on Washington's UCC Article 9A. During trial, counsel and the trial court discussed whether Washington's UCC Article 9A applied and what instructions to provide to the jury in regard to the 12 vehicles in dispute. The trial court agreed with Gage's argument that an exception to Washington's UCC Article 9A definition of consignment existed:

> I am persuaded that if there is knowledge of the presence of consigned assets at the time that the security interest is filed by the filer of the security interest, then it doesn't cover the consigned property.
>
> While there is no case law in Washington State, there is case law from other jurisdictions, and it just makes sense to me.

> You can't undermine knowingly someone else's interests when you know that there are consigned interests and then you file your security interest. That just fundamentally seems wrong.
>
> The question of whether [Wren] knew or should have known, that's a whole different ball game.

9 VRP (Mar. 9, 2023) at 1232. The trial court further stated:

> [Under] [RCW 62A.9A-102(20)](A)(iii), [t]he merchant, deals in goods of that kind under a name other than the name of the person making the delivery, i.e., the consignor.
>
> Is not an auctioneer, okay.
>
> Is not generally known by its creditors to be substantially engaged in selling the goods of others.
>
> That's the problem because it was clear that there has been consignment, even if these 12 vehicles, notwithstanding, there were consignment sales here in this case.

9 VRP (Mar. 9, 2023) at 1237-38. Wren's proposed jury instructions regarding the 12 vehicles centered on application of Washington's UCC Article 9A and walked through several definitions found within Article 9A. However, the trial court stated, "I don't want a surplusage. It might be the law, but if it's not applicable to anything before the jury . . ." 9 VRP (Mar. 9, 2023) at 1237.

Ultimately, the trial court stated:

> I don't think the UCC applies because the statute does not apply it, and, in the absence of case law, I am guided by foreign case law, which I think would apply in this situation, so that makes Instruction 13 from the Whiteheads to clearly define the scope of the dispute.
>
> If Wren knew Gage was consigning, [Stanford], rule in favor of Gage. If Wren knew that [Stanford] was substantially engaged in selling the goods of others, you rule in favor of Gage with regard to 12 vehicles.

If you determine that Wren did not know [Stanford] was substantially engaged in selling the goods of others and did not know Gage was consigning vehicles at [Stanford], then you rule in favor of Wren.

That's the one that I'm going to give.

9 VRP (Mar. 9, 2023) at 1247-48.

During trial, Butch testified that Stanford's arrangement with J&N was a consignment arrangement. Butch also testified that on Stanford's balance sheets, provided to Wren in advance of Wren making his loans, the line item "Consigner Inventory" was in reference to vehicles imported by J&N. Ex. 518, at 1.

Moreover, the record shows that both Wren and Asquith received, reviewed, and discussed Stanford's balance sheets, which showed consignment vehicles as part of the inventory. Wren also testified that it was normal for a used car dealership, such as Stanford, to consign vehicles. Further, the record shows that during the exclusivity agreement that Stanford had with J&N, Stanford's vehicles appear to have been almost entirely provided by J&N and the "Consigner Inventory" on Stanford's balance sheets constituted the vast majority of Stanford's assets. Ex. 518, at 1.

Thus, the evidence showed that Wren was generally aware that Stanford was substantially engaged in selling the goods of others. Therefore, Washington's UCC Article 9A does not apply.[28] Accordingly, the trial court did not err in declining to give jury instructions that applied Washington's UCC Article 9A.

---

[28] In response to a SVQ, the jury found that Wren was generally aware that Stanford was substantially engaged in selling the goods of others.

G.    TRIAL COURT ATTORNEY FEES (AOE 35-37)

Wren argues that the trial court erred when it granted Gage's motion for attorney fees and costs under RCW 7.64.035(1)(b). Gage argues that the trial court's award of attorney fees under the replevin statute was appropriate in light of the jury verdict awarding him the 12 vehicles in dispute.

Because the trial court erred when it determined as a matter of law on partial summary judgment that Stanford had a consignment agreement with Gage and that Stanford breached that agreement, the resulting judgment involving the 12 vehicles in dispute is reversed. Accordingly, the award of attorney fees to Gage based on the award of the 12 vehicles to Gage is necessarily reversed. However, if on remand, the trier of fact finds Gage is entitled to the 12 vehicles in dispute, we agree with Gage that an award of attorney fees is appropriate under the replevin statute.

1.    Legal Principles

Washington's replevin statute allows for an award of attorney fees:

> If the plaintiff executes to the defendant and files in the court a bond in such sum as the court may order, with sufficient surety to be approved by the clerk, conditioned that the plaintiff will prosecute the action without delay and that if the order is wrongfully sued out, the plaintiff will pay all costs that may be adjudged to the defendant and all damages, court costs, reasonable attorneys' fees, and costs of recovery that the defendant may incur by reason of the order having been issued.

RCW 7.64.035(1)(b).

We review an award of attorney fees for abuse of discretion. *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 519, 910 P.2d 462 (1996). "In order to reverse an attorney fee award, an appellate court must find the trial court . . . exercised its discretion on untenable grounds or for

70

untenable reasons." *Chuong Van Pham v. City of Seattle*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

>    2.    Award of Attorney Fees and Costs under Replevin Statute

Here, Wren's complaint included a replevin cause of action for the 12 vehicles in dispute. In February 2020, Wren obtained an order from the trial court granting replevin and entering a preliminary injunction, which ordered Gage to deliver to Wren the one of the six vehicles in Gage's possession that he had not sold. The order also authorized Wren to sell the six vehicles in his possession, along with the one vehicle Gage was to deliver to Wren, and then directed Wren to place the proceeds in the court registry pending litigation. Following trial, the jury found that all 12 vehicles in dispute belonged to Gage. The trial court entered judgment in favor of Gage, entitling him the proceeds of the court registry.

RCW 7.64.035(1)(b) states that if a replevin order is wrongfully sued out, "the plaintiff will pay all costs that may be adjudged to the defendant and all damages, court costs, reasonable attorneys' fees, and costs of recovery that the defendant may incur by reason of the order having been issued." If on remand, the trier of fact determines that Gage is entitled to the 12 vehicles, Wren's replevin action as it pertained to those 12 vehicles was "wrongfully sued out," and Gage is entitled to recover attorney fees and costs under the replevin statute.

CONCLUSION ON KENNETH WREN APPEAL

We affirm the trial court's judgments and orders regarding defamation, criminal profiteering, voidable/fraudulent transfers, and the application of Washington's UCC Article 9A. But we reverse the trial court's partial summary judgment on the issue of whether there was a consignment agreement between Gage and Stanford and the resulting judgment involving the 12

disputed vehicles. We also reverse the trial court's determination that Gage was entitled to an award of attorney fees and costs. Accordingly, we remand the issue of the existence of a consignment agreement and whether that agreement was breached for further proceedings consistent with this opinion.

## ATTORNEY FEES ON APPEAL

Gage requests an award of attorney fees and costs on appeal based on RCW 7.64.035(1)(b). Under RAP 18.1(a), a party may request attorney fees and costs on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." However, issues remain to be resolved in this case. Therefore, we deny Gage's request for attorney fees and costs on appeal.

## CONCLUSION

With regard to Gage's appeal, we affirm. With regard to Wren's appeal, we affirm in part, reverse in part, and remand the issue of the existence of a consignment agreement and whether that agreement was breached for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

MAXA, J. (concurring) – I agree with the lead opinion regarding all issues, but I write separately to provide my thoughts regarding Gage Whitehead's defamation award in light of Judge Cruser's dissent.

*Alleged Defamatory Statements*

At trial, Gage relied on several statements to support his defamation claim:

1. August 13, 2019 text message from Kenneth Wren to Steve Ford: "We found payment of almost all cars Gage claims as coming from our checkbook." Ex. 520.

2. September 1, 2019 text message from Wren to Jim Kriens: "[Butch] is going to put himself and his son in jail. We are waiting for the Puyallup police to make a decision of the fraud, embezzlement and forgery issues." Ex. 523. "It's really bad." Ex. 523. And "[t]his will change Butch, Gage and Murphy's life forever." Ex. 523.

3. December 8, 2019 email from Wren to Flynn Schaeffer attaching the draft complaint, and saying "Have a look at this. We plan to file this week and would like your friend at the Puyallup PD to take a look if we can." Ex. 522.

4. January 18, 2020 email from Wren to Mike Wheeler attaching the filed complaint.

5. January 19, 2020 email from Wren to Ford attaching the filed complaint.

6. January 20, 2020 email from Wren to Tim Pattison attaching the filed complaint.

*CR 50/Sufficient Evidence*

I believe that a reasonable jury could find that the first three statements listed above were defamatory. The email to Shaeffer could be protected by a qualified privilege, but that is a jury question. Therefore, based on those three statements alone, I agree with the lead opinion that the

trial court did not err in denying Wren's CR 50 motion to dismiss the defamation claim and that the evidence was sufficient to support the jury's defamation finding.

*Sending Filed Complaint*

The three communications in which Wren sent the *filed* complaint to Wheeler, Ford, and Pattison are different. At that point, the complaint was a matter of public record. The general rule is that there is a conditional privilege for republishing "documents filed and available for public inspection." *Herron v. Tribune Pub. Co.*, 108 Wn.2d 162, 179, 736 P.2d 249 (1987). The privilege is conditional because it "requires that the republication constitute an 'accurate and complete or a fair abridgement of the occurrence reported.' " (quoting *Mark v. Seattle Times*, 96 Wn.2d 473, 487, 635 P.2d 1081 (1981)). This privilege applies to civil cases. *Herron*, 108 Wn.2d at 179.

*Herron* cited to and relied on § 611 of the *Restatement (Second) of Torts* (Am. Law. Inst. 1977). *Herron*, 108 Wn.2d at 179. Section 611 states,

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

The dissent relies on *Herron* and Restatement § 611 to support the conclusion that the emails to Wheeler, Ford, and Pattison attaching the filed complaint cannot form the basis of a defamation claim.

However, comment e to § 611 states,

> A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. *The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section.*

74

> An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action.

(Emphasis added.)

In addition, comment c to § 611 states, "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not." Combining the two comments, under the *Restatement* a person is not entitled to a conditional privilege if they file a complaint and before any judicial action has been taken they send their own complaint to other people.

Those are the facts here. Wren filed his complaint in which he made allegedly false allegations against Gage. Before any judicial action was taken, Wren sent his own complaint to three people.

No Washington court has addressed the applicability of comment c or comment e to § 611. I disagree with comment e to the extent that it would apply to an *independent third person* who disseminates a filed complaint before any judicial action has been taken. And some courts have expressly rejected the judicial action requirement. *E.g.*, *Solaia Technology, LLC v. Specialty Pub. Co.*, 221 Ill. 2d 558, 589, 852 N.E.2d 825 (2006).

But especially in light of comment c, it is incorrect to conclude that the qualified privilege *necessarily* applies when a person disseminates a complaint that they filed. Until a Washington court rules on this issue, it remains an open question.

*Proposed Jury Instructions*

Arguably, this court could decide as a matter of law whether comments c and e to § 611 would subject Wren to liability for disseminating his own filed complaint. But given the issues presented in this appeal, such a decision is unnecessary.

Relevant to the emails attaching Wren's complaint, Wren claims on appeal that the trial court erred in failing to give his proposed jury instruction 55 and proposed special verdict question (SVQ) 56. But the court did not err in refusing these proposed instructions.

Proposed instruction 55 stated in part,

> The Court has determined that both the absolute and qualified privileges apply, with the absolute privilege applying to statements made after this lawsuit was filed on January 17, 2020, and the qualified privilege applying to statements made prior to January 17, 2020. You are accordingly instructed to weigh the evidence related to allegedly defamatory statements to only those statements made prior to January 17, 2020.

CP (58272-4-II) at 2991. However, *Herron* makes clear that even if the public record privilege applies, it is a *qualified* privilege, not an absolute privilege. 108 Wn.2d at 179. The court expressly distinguished absolute privileges from the public record privilege: "The [absolute] privilege ordinarily applies only to statements made *in the course* of official proceedings, and not to statements made *about* such proceedings." *Id.* at 177-78.

As a result, the statement in proposed instruction 55 that the absolute privilege applies to all statements made after the lawsuit was filed was legally incorrect. A trial court does not err by refusing to give a legally erroneous instruction. *Hendrickson v. Moses Lake School District*, 192 Wn.2d 269, 428 P.3d 1197 (2018); *see also Griffin v. West RS, Inc.*, 143 Wn.2d 81, 90, 18 P.3d 558 (2001) ("The trial court . . . had no duty to give an incorrect instruction."). Therefore, the trial court did not err here in failing to give Wren's proposed instruction 55.

Proposed SVQ 56 states, "What was Kenneth Wren's false statement of fact about Gage Whitehead, when did he say it, and who did he say it to?" CP (58272-4-II) at 3084. Itemizing each act that constitutes a tort certainly is not required in a typical civil case. The dissent argues that such an itemization is required in defamation cases because of First Amendment implications. But there is no Washington case that states or even suggests such a rule. In the absence of any authority, I am not willing to adopt such a rule. Therefore, the trial court did not err here in failing to give Wren's proposed SVQ 56.

Because there was no trial court err regarding Gage's defamation claim, the jury's defamation verdict must stand.

Maxa, J.

Cruser, C.J. (dissenting in part)

## FACTS

### I. BACKGROUND

Kenneth Brautigan is the sole owner and manager of Stanford & Sons, LLC (Stanford). Brautigan formed Stanford in 2009 with the assistance of Herbert "Butch" Whitehead (Butch). Butch oversaw Stanford's "cash flow, inventory and buying." Resp't's Clerk's Papers (CP) at 749. Brautigan was involved with the day-to-day operations of Stanford, such as reconditioning vehicles and vehicle sales. Butch's son Gage also worked for the company and assisted Butch with purchasing vehicles for Stanford in Canada. Butch and Gage were the only individuals associated with Stanford who conducted business in Canada.

In response to financial difficulties, Kenneth Wren, a longtime friend of Brautigan who also worked in the car industry, gave Stanford a loan at Brautigan's request. As security for Wren's loans to Stanford, Wren would maintain possession of the title documents for vehicles purchased for Stanford's lot.

In July 2019, Brautigan decided to shut down Stanford due to continued financial difficulties. Brautigan and Wren executed a bill of conveyance in lieu of foreclosure. The bill of conveyance conveyed, among other collateral, a truck, boat, and trailer to Wren. According to Butch, Brautigan had already offered Gage the truck, boat, and trailer as partial payment in lieu of monies owed to Gage for his consignment vehicles. Butch requested permission to take the truck, boat, and trailer on a pre-planned family vacation to eastern Washington. Wren agreed, provided that Butch bought insurance for the boat and trailer and returned the vehicles by August 8 if he did not intend to purchase them. According to Wren, Butch expressed a desire to purchase the boat,

truck, and trailer, which was part of the reason Wren agreed to let Butch take the vehicles on vacation. Further, per Wren, neither Butch nor Gage disputed that title of the boat, truck, and trailer had been transferred to Wren.

After the trip to eastern Washington, Butch and Gage took the boat, truck, and trailer to Arizona. The Whiteheads left the vehicles in Arizona and did not respond to requests to return them. According to Gage, he believed the boat, truck, and trailer belonged to him and he did not understand that Wren wanted the vehicles returned.

## II. PROCEDURAL HISTORY

In January 2020, Wren filed a complaint against several defendants, including Stanford, Butch, and Gage. Specifically, Wren alleged 10 causes of action against the defendants. The causes of action include: (1) failure to repay promissory notes against Stanford in the amount of $1,187,872; (2) violations of the Uniform Fraudulent Transfer Act, former ch. 19.40 RCW (1987), and Uniform Voidable Transactions Act, ch. 19.40 RCW, against Gage; (3) an action for replevin for vehicle titles transferred to J&N, which included the six vehicles that Butch and Gage took on July 16, 2019; (4) conversion and unjust enrichment; and (5) fraud and theft in violation of Washington's Criminal Profiteering Act, ch. 9A.82 RCW. Gage countersued, alleging that Wren defamed him by (1) sharing copies of his complaint with various individuals, (2) reviewing a letter Brautigan drafted for his customers in Canada, (3) and texting about the dispute. The individuals with whom Wren communicated all work in the auto industry in various capacities.

Prior to filing the complaint, Wren sent copy of his draft complaint to Schaefer via email. Wren requested that Schaefer read the complaint and show it to a friend of his at the Puyallup Police Department.

After the complaint was filed, Wren sent a copy of his complaint to Ford, attached to an email that stated:

> Hi Steve, just wanted to give you an update on the lawsuit with Butch. Butch got served last night and I hope he won't try anything stupid or who knows what? Anyway it's public record now and Jen will have a better understanding of what Butch and Gage has been up to. Murphy the guy Butch used to steal and transfer titles is named in the lawsuit also. We are looking for him to serve now.

Appellant's CP at 2647. Wren also sent copies of his complaint to both Pattinson and Wheeler.

In December 2019, Brautigan sent a letter to Stanford's Canadian customers after Wren reviewed the letter and provided feedback. The letter stated in part:

> My name is Kenneth Brautigan and I am sole member/owner of Stanford and Sons LLC/Puyallup Car and Truck in Washington State. In July of this year I was forced to close my dealership due to embezzlement and fraud committed by several people associated with my company.
> . . . .
> Because of the manner in which the embezzlement and fraud occurred, some of the purchase orders and other documents were altered between the time the customer was paid and the vehicle was retailed at my store. Basically, I am just trying to decipher the dollar amount that was taken fraudulently.
> . . . .
> . . . I had entrusted my faith in people who did not have my family or my business's best interests at heart and now I am trying to pick up the pieces of my life's work.

Ex. 527 at 2.

In a text exchange with Kriens, Wren and Kriens discussed the dispute. Wren stated:

> Butch has hid my cars and boat. So I repossessed his sons and daughters [sic] cars. Had to hire a private investigator in [C]anada. Forensic accountant. Crime related litigator. Handwriting expert. I tried to get [Butch] to sit down. I even tried to talk to his wife. He's going to put himself and his son in jail. We are waiting for the Puyallup police to make a decision on the fraud embezzlement and forgery issues.

Ex. 523 at 1.

Gage alleged that these communications caused him damages. Specifically, Gage claimed that following these communications, the Whiteheads and the Fords no longer had a relationship. Additionally, Gage alleged that the individuals and businesses Wren communicated with regarding his complaint stopped conducting business with Gage. And, according to Gage, he experienced a significant drop-off in business referrals in Canada.

The matter proceeded to a jury trial. The jury found that Gage had intentionally converted the truck, boat and trailer and entered a judgment in favor of Wren. The jury also found that Wren defamed Gage and awarded Gage $403,166.67 in damages. The jury did not make any findings as to which specific statements were defamatory.

DISCUSSION

The majority affirms the jury's defamation verdict against Wren. I disagree with the majority's decision. Because at least some of the allegedly defamatory statements that Gage relied upon for his defamation claim are protected speech that cannot form the basis of a defamation claim as a matter of law, the judgment must be reversed and the case remanded for a new trial limited to only those statements that are truly actionable.

I. LEGAL PRINCIPLES

The plaintiff in a defamation case must prove four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34, 43-44, 108 P.3d 787 (2005). Washington case law has distilled these elements from the Restatement (Second) of Torts § 558 (Am. L. Inst. 1976), and in doing so "omits concepts that have long been part of the law of defamation" including the basic requirement that the statement be defamatory in order to be actionable. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579,

588-89, 943 P.2d 350 (1997). Defamation's fundamental principles require us to determine whether the defendant made a false statement that caused damage to the plaintiff's compensable interest and, if so, whether the defendant should be held liable. *Id.* at 589. When determining whether the defendant's conduct meets the definition of defamation, we must consider "(a) whether the defendant uttered the statement in issue; (b) whether the statement in issue was false in whole or in part; and (c) whether the statement's falsity, if any, was a cause of damage to the plaintiff." *Id.* When determining whether the defendant should be held liable, we must consider "(a) whether the defendant was at fault to the degree required by law . . . and, (b) even if the defendant was at fault, whether his or her fault was excused or justified by the existence of an absolute or conditional privilege." *Id.* at 590.

"When 'it is impossible to know, in view of the general verdict returned' whether the jury imposed liability on a permissible or an impermissible ground, 'the judgment must be reversed and the case remanded.' " *Miller v. Argus Publ'g Co.*, 79 Wn.2d 816, 834, 490 P.2d 101 (1971) (internal quotation marks omitted) (quoting *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 11, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970)), *overruled on other grounds by Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 546 P.2d 81 (1976).

A. FALSITY

"A defamation claim must be based on a statement that is provably false." *Schmalenberg*, 87 Wn. App. at 590. The determination of whether a statement is actionable fact or nonactionable opinion is a question of law for the court. *Benjamin v. Cowles Publ'n Co.*, 37 Wn. App. 916, 922, 864 P.2d 739 (1984). To determine whether a statement is fact or opinion, courts consider " '(1) the medium and context in which the statement was published, (2) the audience to whom it was

published, and (3) whether the statement implies undisclosed facts.' " *Life Designs Ranch, Inc. v. Sommer*, 191 Wn. App. 320, 330, 364 P.3d 129 (2015) (internal quotation marks omitted) (quoting *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 365, 287 P.3d 51 (2012)). Regarding the first factor, "[t]he court should consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary 'terms of apparency.' " *Dunlap v. Wayne*, 105 Wn.2d 529, 539, 716 P.2d 842 (1986) (quoting *Info. Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)). The form of the statement is inconsequential. *Schmalenberg*, 87 Wn. App. at 591. "A statement meets this test to the extent it falsely expresses or implies provable facts." *Id.* at 590.

B. Unprivileged Communication

Whether a privilege exists is a question of law to be decided by the court when the facts are not in dispute as to the circumstances of the alleged defamatory communication. *Valdez-Zontek v. Eastmont Sch. Dist.*, 154 Wn. App. 147, 162, 225 P.3d 339 (2010). Washington law recognizes a conditional privilege protecting republishers when the defamatory statement originally was made in the course of an official proceeding or contained in an official report. *Herron v. Tribune Pub. Co., Inc.*, 108 Wn.2d 162, 179, 736 P.3d 249 (1987). The privilege applies to documents filed and available for public inspection. *Id.* This privilege exists to "serve the public's interest 'in having information made available to it as to what occurs in official proceedings.' " *Id.* (quoting Restatement (Second) of Torts at § 611 cmt. a (Am. L. Inst. 1977)).

Similarly, "the parties, witnesses, lawyers, judges, and jurors in court proceedings, each are clothed with absolute immunity for any defamatory statements made in the course of official proceedings, provided the statements pertain to the subject matter of the proceedings." *Id.* at 177.

It is true that "the scope of absolute privilege has traditionally been limited to situations in which authorities have the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct." *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 476, 564 P.2d 1131 (1977). However, this general rule does not exclude draft complaints, which are later filed with the court, from the privilege. The Restatement clarifies that parties to private litigation are "absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, . . . if the matter has some relation to the proceeding." Restatement (Second) of Torts at § 587 (Am. L. Inst. 1977). The comment to the rule further clarifies that communications preliminary to a proposed judicial proceeding are privileged "when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration." *Id.* at cmt. e.

RCW 4.25.510 provides that a person who communicates information to local government "is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization." In enacting RCW 4.25.510, the legislature recognized that "[i]nformation provided by citizens concerning potential wrongdoing is vital to effective law enforcement." RCW 4.24.500.

C. FAULT

If the defamed party is a private figure, only negligence need be shown. *Maison de France*, 126 Wn. App. at 44. A defendant is negligent when they " 'knew or, in the exercise of reasonable care, should have known that the statement was false or would create a false impression in some material respect.' " *Id.* (quoting *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675, 680, 713 P.2d 736 (1986)).

D. DAMAGES

In a defamation case, special damages, meaning pecuniary harm, must be alleged and proven, unless a publication constitutes libel per se. *Purvis v. Bremer's Inc.*, 54 Wn.2d 743, 747, 344 P.2d 705 (1959). Additionally, the plaintiff must establish a factual causal link between these damages and the defendant's wrongful conduct. *Schmalenberg*, 87 Wn. App. at 598.

A statement is defamatory per se if it "(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office. *Caruso v. Loc. Union No. 690*, 100 Wn.2d 343, 353, 670 P.2d 240 (1983).

## II. ANALYSIS

The majority affirms the jury's verdict that Wren defamed Gage, but fails to analyze how any single statement meets all of the elements of defamation. This is error. Through a particularized examination of each allegedly defamatory statement, it is clear that, as a matter of law, at least some of the statements the jury was permitted to rely on were not actionable in defamation as a matter of law.

A. REPUBLISHING WREN'S COMPLAINT

Wren did not defame Gage by sharing the complaint with Schaeffer, Ford, Pattinson, and Wheeler. The complaint did not contain false statements of fact. The majority characterizes the determination of whether a statement is fact or nonactionable opinion as a factual determination for the jury, but it is a question of law for the court. *Benjamin*, 37 Wn. App. at 922. In making this determination, courts emphasize the importance of considering the totality of the circumstances in which the statement was made. *Dunlap*, 105 Wn.2d at 539. Allegedly defamatory statements

contained within a civil complaint are by their very nature qualified with "cautionary 'terms of apparency.' " *Id.* (quoting *Info. Control Corp.*, 611 F.2d at 784). The complaint is filed prior to discovery and prior to any intervention by a court or a jury. The audiences who read complaints understand that they contain mere unsubstantiated allegations. See *Id.* (statements of opinion and exaggeration should be expected in letter written during negotiations by one attorney to another).

The majority's ruling subjects anyone to liability in defamation who, suspecting that they have suffered a legal wrong but without the benefit of discovery, drafts a complaint in good faith that turns out to have been incorrect and shares the complaint with someone else prior to the court taking any action in the matter. This approach encroaches too far into the realm of constitutionally protected speech.

Moreover, this result is illogical where Washington law recognizes a conditional privilege protecting republishers when the defamatory statement originally was made in the course of an official proceeding or contained in an official report. *Herron*, 108 Wn.2d at 179. The privilege applies to documents filed and available for public inspection. *Id.* This privilege exists to "serve the public's interest 'in having information made available to it as to what occurs in official proceedings.' " *Id.* (quoting Restatement (Second) of Torts at § 611 cmt. a (Am. L. Inst. 1977). Here, Wren merely republished his complaint when he emailed it to various individuals after the complaint was filed. Accordingly, these communications were privileged and Wren could not be liable in defamation as a matter of law.

Nor could Wren be held liable in defamation as a matter of law for sharing his complaint with Schaefer. Wren sent a copy of the complaint to Schaefer prior to filing the complaint for the purpose of providing information to law enforcement. The Restatement of Torts suggests that

communication of a draft complaint prior to filing is privileged, so long as "the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration." Restatement (Second) of Torts § 587 cmt. e. But even assuming that Wren shared the complaint with Schaefer for reasons totally unrelated to his civil claim, Wren's email to Schaefer is protected by RCW 4.24.510. Wren is not required to communicate his complaint directly to the government to be afforded protection under RCW 4.24.510. It is common for individuals to contact law enforcement through a third party where either, the individual is too traumatized to communicate with law enforcement directly, or where, like here, the third party has a direct line to law enforcement officers in non-emergency situations. Because the purpose of RCW 4.24.510 is to facilitate the free reporting of information to government agencies, it only makes sense that these communications, made to third parties for the purpose of reporting to law enforcement, should also be protected. RCW 4.24.500. Again, whether a privilege applies is a question of law for the court. *Valdez-Zontek*, 154 Wn. App. at 162.

Finally, it is impossible that the communication of this complaint caused Gage's harm where the complaint was filed with the court and publicly available. The individuals Wren shared the complaint with are exactly the same individuals who are familiar enough with the parties and the circumstances to request to see the complaint themselves.

## B. BRAUTIGAN'S LETTER

As a matter of law, Wren cannot be held liable in defamation for the letter Brautigan drafted and published. It was Brautigan, the owner of Stanford and Sons and a credible figure in the car dealing community, who authored and published the letter to customers in Canada. It was Brautigan's imprimatur that caused the harm, if any, to Gage. Wren merely reviewed Brautigan's

writing and provided feedback. Gage cites to no Washington State authority for the proposition that Wren can be held liable in defamation for a statement that he did not publish or adopt. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

C. TEXT MESSAGES REGARDING THE DISPUTE

The majority concludes that substantial evidence supported the jury's finding that Wren's text message stating "[Butch is] going to put himself and his son in jail. We are waiting for the Puyallup police to make a decision on the fraud embezzlement and forgery issues" constituted defamation. Ex. 523 at 1. I disagree.

The structure of this sentence makes it clear that Butch, rather than Gage, is the one responsible for any wrong doing. That said, to the extent that the "fraud embezzlement and forgery" refers to Gage's civil liability, the statement is substantially true, and therefore not defamatory, because Gage was found to have committed conversion. *Id.* Furthermore, the jury did not make any specific findings as to which statements constituted defamation. Consequently, even if the message could be viewed as defamatory as to Gage's alleged criminal conduct, it is unknown whether the jury relied on this ground or a statement made in the proper exercise of Wren's first amendment rights. Accordingly, we must reverse and remand. *Miller*, 79 Wn.2d at 834.

CONCLUSION

Because I would hold that, as a matter of law, Wren is not liable in defamation for sharing his complaint or for Brautigan's letter, I would reverse in part and remand for the trial court to determine whether the remaining statements were defamatory and to reevaluate damages. *See*

*Story v. Shelter Bay Co.*, 52 Wn. App. 334, 341, 760 P.2d 368 (1988) ("We therefore hold that the trial court erred in refusing to find Story's defamatory statements to HUD and the Department of Licensing absolutely privileged, and remand to the trial court for a determination of the effect our holding has on the damage award."); *see also Liberty Bank of Seattle, Inc. v. Henderson*, 75 Wn. App. 546, 568, 878 P.2d 1259 (1994) (remanding to trial court where other statements were not directly addressed by the trial court's summary judgment ruling).

Cruser, C.J.

CRUSER, C.J.